## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

JOHN DOE, a minor, by and through his
Parent, L.B.;                                    Case No. C2-91-464

And                                    :

                                                 **Judge Holschuh**
T.M., a minor, by and through his      :
Parent, S.J.;                                    **Magistrate Judge Kemp**
                                       :
And                                              **AMENDED CLASS ACTION**
                                       :         **COMPLAINT FOR DECLARATORY**
L.J., a minor, by and through her                **AND INJUNCTIVE RELIEF**
Parents, Mr. and Mrs. J.J.;            :

And                                    :

T.D., a minor, by and through his      :
Parent, A.D.;
                                       :
And

                                       :
L.A., a minor, by and through his
Parent, E.A.;                          :

And                                    :

B.M., a minor, by and through her      :
Parent, D.M.;
                                       :
And
                                       :
S.W., a minor, by and through her
Parent, C.S.;                          :

And                                    :

M.G., a minor, by and through his      :
Parent, J.G.;

                Plaintiffs,
                                       :
        v.
                                       :

**State of Ohio;**

**And**                                                :

**Robert Taft, in his official capacity**    :
**as Governor of the State of Ohio;**

                                                    :
**And**

                                                  :
**The Ohio Schools Facilities Commission;**

**And**                                                :

**Susan Zelman, in her official capacity**
**As the State Superintendent of Public**  :
**Instruction;**

                                                  :
**And**

                                                  :
**The Ohio State Board of Education;**

                                                  :
**And**

                                                  :
**The Ohio Department of Education;**

**And**                                                :

**The Office for Exceptional Children, Ohio**
**Department of Education;**      :

**And**                                                :

**The Office for Early Learning and School**
**Readiness, Ohio Department of Education;**  :

               **Defendants.**

                                                  :

## JURISDICTION AND VENUE

1.  Jurisdiction is conferred on this court by 28 U.S.C. § 1343(3), which gives United States District Courts original jurisdiction in suits to provide relief for the deprivation of civil rights under color of state law.

2.  Jurisdiction is conferred on this court by 28 U.S.C. § 1331, which gives United States District Courts original jurisdiction in suits arising under the Constitution or laws of the United States and against defendants acting under color of state law, pursuant to  42 U.S.C. § 1983.

3.  Jurisdiction to grant declaratory, injunctive or other proper relief is conferred on this court by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

4.  Venue in this district is proper under 28 U.S.C. § 1391(b).

## PARTIES

### I. PLAINTIFFS

#### A.    Plaintiffs LB. and John Doe

5.  L.B. is the mother and natural guardian of John Doe.

6.  John Doe is thirteen years old.

7.  John Doe is a resident of the Franklin City School District in Warren County, Ohio.

8.  John Doe has a cortical vision impairment due to a brain injury that is consistent with shaken baby syndrome.  John Doe also has been diagnosed as having Attention Deficit Hyperactivity Disorder.

9.  John Doe is a student with disabilities and has an individualized education program (IEP) for the provision of special education and related services. He is eligible for

and entitled to a free appropriate public education (FAPE) under the Individuals with

Disabilities Education Improvement Act (IDEIA); 20 U.S.C. Sections 1401, *et seq.*[1]

10. Franklin City School District has been unable to pass school levies for several years.

11. L.B. filed a complaint on behalf of John Doe against the Franklin City School

District.

12. The complaint was filed with the Ohio Department of Education (ODE), Office for

Exceptional Children (OEC) on April 15, 2004.

13. In her complaint, L.B. alleged that the Franklin City School District failed to

implement John Doe's IEP, failed to offer education in the least restrictive

environment (LRE) and had predetermined John Doe's placement for junior high in

2005-2006 as being a self-contained classroom operated by the Warren County

Board of Mental Retardation and Developmental Disabilities (WCMR/DD).

14. In her complaint, L.B. alleged that the district failed to offer a continuum of

placement options, made placement decisions based on administrative convenience

and funding issues, and denied access to the general education curriculum.

15. ODE issued a letter to the district on April 30, 2004, outlining the issues raised in

L.B.'s complaint.

16. ODE refused to address the funding issues.

17. The April 30, 2004 letter also declined to address "future areas of non-compliances"

such as the lack of a continuum of placement options and concerns about the

WCMR/DD classroom.

18. ODE issued a "letter of findings" (LOF) dated June 1, 2004.

---

[1] The IDEA was reauthorized and amended in 2004 and was renamed the Individuals with Disabilities Education Improvement Act or IDEIA. Throughout this complaint the acronyms IDEA and IDEIA are used interchangeably.

19. The LOF found no violations of the Ohio Operating Standards for the Education of Children with Disabilities (Ohio Administrative Code Chapter 3301-51) or the IDEIA.

20. ODE's complaint investigators reached their conclusions without contacting the parent, her advocates or private providers who had attended IEP meetings. The investigators only interviewed school personnel and the school's attorney.

21. Although ODE reopened the complaint at the parent's request, ODE has not found any violations and has closed the complaint.

22. Franklin City School District continues to fail to implement portions of John Doe's IEP and has proposed placement of John Doe in the self-contained classroom at the junior high school for the 2005-06 school year.

23. On information and belief, Franklin City School District does not provide transportation as a related service on any student's IEP.

24. ODE has received a complaint from another parent of a student with disabilities regarding the lack of transportation in Franklin City School District but ODE found no violation of the Ohio Operating Standards or the IDEIA.

25. The lack of funding has affected the district's decisions about services to students with disabilities and has denied those students a free appropriate public education (FAPE).

**B. Plaintiffs T.M. & S.J.**

26. T.M. is fourteen years old.

27. T.M. resides with his mother S.J. in the Bethel-Tate Local School District in Clermont County, Ohio.

28. T.M. has severe and multiple disabilities including speech and language, hearing, vision and orthopedic impairments.

29. T.M. has an IEP and receives special education and related services.

30. T.M. is eligible for and entitled to a free appropriate public education under the IDEIA.

31. S.J. requested that the school district provide T.M. with assistive technology, specifically a laptop computer, I Communicator and Read and Write Gold Version 7.0 software.

32. T.M. needs appropriate assistive technology in order to receive a free appropriate public education.

33. Bethel-Tate Local Schools officials informed S.J. that if S.J. could find grant funding for the requested assistive technology, the district would write a grant request in order to fund the device.

34. To date, S.J. has not found a funding source for assistive technology for her son and therefore T.M. does not have access to the device and software.

35. Bethel-Tate Local Schools officials have denied T.M. needed assistive technology devices, services and software based on a lack of funding for special education students.

**C. Plaintiffs L.J. and Mr. and Mrs. J.J.**

36. L.J. is six years old.

37. L.J. resides with her parents, Mr. and Mrs. J.J. in the Warren Local School District in Washington County, Ohio.

38. L.J. was diagnosed with Down Syndrome at birth.

39.   L.J. is eligible for and entitled to a free appropriate public education under the
      IDEIA.

40.   L.J. has finished special education preschool and will be entering kindergarten in the
      2005-06 school year.

41.   During her preschool years, L.J. had an IEP that included the services of an
      aide/paraprofessional, occupational therapist, physical therapist and speech therapist.

42.   L.J. also received extended school year (ESY) services during the summer months,
      in accordance with her IEP.

43.   L.J.'s 2004-2005 IEP provided that "the parents will pay the difference of charges
      that exceed the usual and customary costs" of a PROMPT[2] trained therapist.

44.   In developing L.J.'s IEP for the 2005-06 school year, the district initially refused to
      provide L.J. with an aide because of the cost.

45.   In developing L.J.'s IEP for the 2005-06 school year, the district has refused to
      provide ESY services to L.J, even though she had received the service during
      preschool and the service was recommended by L.J.'s therapist as necessary to
      provide a free appropriate public education.

46.   Because of the district's refusal to provide ESY services to L.J. during the summer
      of 2005, the parents are assuming responsibility for the costs.

47.   Warren Local Schools officials have repeatedly used lack of funds as a reason to
      deny needed special education services to L.J. and other students with disabilities in
      the district.

---

[2] PROMPT, Prompts for Restructuring Oral Muscular Targets,  is a multidimensional, multi-sensory therapeutic system that is holistic and dynamic. PROMPT uses tactile- kinesthetic articulatory prompts (cues) on the jaw, face and under the chin, that help to develop or restructure speech production output.

48.  Warren Local Schools spent $102,246.00 less on students with disabilities than required by state law.

49.  The State has not addressed the failure of any Ohio school district to spend the required amount on services to students with disabilities.

**D.  Plaintiffs A.D. and T.D.**

50.  A.D. is the parent and natural guardian of T.D.

51.  A.D. and T.D. reside in the Wellston City School District in Jackson County, Ohio.

52.  T.D. is thirteen years old and has been receiving special education services since preschool.

53.  T.D. is classified by Wellston Schools as a child with specific learning disabilities (SLD). T.D. is eligible for and entitled to a free appropriate public education under the IDEIA.

54.  Since the third grade, T.D. has been diagnosed by private professionals as having emotional and developmental disabilities.

55.  The district refuses to recognize these diagnoses and to take them into consideration in changing T.D.'s eligibility to a more appropriate disability category.

56.  The change in disability category could affect the amount and intensity of services to which T.D. would be entitled.

57.  Since T.D.'s diagnoses, T.D.'s private providers have recommended that Wellston Schools provide T.D. with a one-to-one aide to meet his unique educational needs.

58.  A.D. has requested that Wellston Schools provide T.D. with a one-to-one aide and has provided supporting documentation of this need to the district.

59.  Wellston Schools officials have denied T.D. a one-to-one aide.

60. Wellston Schools have cited a lack of funds as a reason for not providing T.D. with a one-to-one aide.

61. T.D. was served in the classroom at the beginning of the 2004-05 school year without the benefit of a one-to-one aide.

62. After about a month into the school year and after several behavioral episodes at home and in school, T.D. was psychiatrically hospitalized.

63. T.D. was psychiatrically hospitalized on several occasions during the 2004-05 school year.

64. Because the school district refused to provide T.D. with appropriate interventions and supports T.D.'s treating professionals determined that T.D. should not return to the classroom setting and instead, should be placed on home instruction until his condition was stabilized and the school environment was designed to address his needs.

65. The district did not begin to provide T.D. with home instruction until the beginning of January, 2005.

66. The district offered to provide the minimum amount of home instruction reimbursed by Ohio standards of one hour per day, without regard to T.D.'s unique needs.

67. The district has not developed an IEP for home instruction.

68. There were gaps in the provision of home instruction to T.D.

69. Because of the inconsistencies in the delivery of home instruction and the minimal amount of instructional time provided to T.D., T.D. did not make adequate progress and did not receive sufficient benefits from instruction.

70. Because of the lack of an appropriate classroom-based program T.D. was denied education with his peers in the least restrictive environment appropriate to his needs.

**E.    Plaintiffs E.A. and L.A.**

71.  E.A. is the parent and natural guardian of L.A.

72.  E.A. and L.A. reside in the Zanesville City School District in Muskingum County.

73.  L.A. is eleven years old.

74.  Since as early as kindergarten, school district personnel have noted problems with L.A.'s behavior.

75.  L.A.'s kindergarten teacher noted concerns such as, non-compliance, defiance, failure to complete tasks and talkativeness. The school principal offered to videotape L.A. in the classroom to observe behaviors. E.A. waited several weeks but was told that the camera was broken and the observation was not done.

76.  In first grade L.A. qualified for Title One Reading services due to his low pre-test scores for first grade. L.A. had several behavior problems during this year including arguing with the teacher. L.A. was sent out of the room to the principal for extended amounts of time. The principal and teacher suggested that L.A. be medicated. The principal also stated that suspension might be a future consequence for L.A.'s negative behavior.

77.  In the spring of 2001 L.A.'s pediatrician referred L.A. to Children's Hospital for a complete behavioral and cognitive evaluation in the psychology department. Follow up visits with the behavioral clinic at Children's Hospital resulted in L.A. being diagnosed with a mild form of ADHD with tendencies towards Oppositional Defiance Disorder (ODD). The psychiatrist wrote a letter to the school stating that

medication would not be required at this time and that modifications and accommodations would meet L.A.'s educational needs best.

78. At the same time the school and parents requested a complete multi-factored evaluation (MFE) of L.A. through the school system.

79. E.A. asked for support from a learning disabled tutor and was told that there was virtually no service at L.A.'s building there being only one person once a week for a group of students.

80. A Section 504 plan[3] was discussed as an alternative to an IEP and as a method to ensure L.A.'s educational success starting the next year.

81. L.A. started the second grade with a Section 504 plan. L.A. was to go to a 'behavioral' support technician to help with social dialogues and situations that seem to precipitate his negative behaviors. The grant for these services was poorly funded and the technician had too many students to see in one day. Services were sporadic and L.A. continued to have behavioral incidents.

82. L.A. entered third grade in the Fall of 2002 with a Section 504 plan. E.A. requested that L.A. not be placed in the modular classroom, as transitions were already a problem for him. Because of overcrowding L.A. was placed in the modular classroom. The bathroom on modular did not work when school started so the students had to go back to the main building.

83. Several behavioral incidents occurred with L.A. and other students in the bathroom. L.A. was to continue with the behavioral support person but it was again sporadic.

---

[3] A Section 504 plan is devised to ensure a free appropriate public education to eligible students pursuant to the Rehabilitation Act of 1973, 29 U.S.C. Section 794 and implementing regulations. Unlike IDEIA and Ohio's Operating Standards, there are no requirements under Section 504 that the student be labeled with a specific disability category.

84.  L.A. continued to be punished for behavior related to his disabilities during the third grade.

85.  During the Spring of 2003, E.A. agreed to place L.A. on Strattera, a prescription mediation used with children who have ADHD.

86.  L.A. entered fifth grade in 2004. Class sizes were larger and the rooms were crowded. Students were required to change classes with three different teachers. Organization, materials, different procedures and rules would be an issue for L.A. L.A.'s grades dropped. His behavior became a problem along with lying.  He was in tears many nights because of the numbers of assignments to complete and the amount of time he needed to work on those assignments.

87.  L.A.'s medication was changed in an attempt to help with the homework issues.  He was punished by the school for not having work done or completed by having to face the school wall for recess.

88.  L.A. started counseling at E.A.'s expense because of the stress, anger and frustration at school.

89.  E.A. discussed with the principal the transition to the new middle school for the 2005-06 school year where L.A. will be required to change classes frequently.  The principal stated that he does not send 504 plans on to the middle school as he feels that they might taint the opinions of some teachers.

90.  L.A. has been provided with summer remediation because he did not meet proficiency/achievement marks.

91.  E. A. has provided tutoring for L.A. at her expense.

92.  E.A. is eligible for and entitled to a free appropriate public education under the IDEIA.

93.  Because of the district's refusal to identify L.A. as being eligible for special education under IDEIA as a student with Other Health Impairments (OHI), L.A. has been denied needed special education services.

94.  The district provides special education services, such as speech services, based upon what is available and not based upon individual students' needs.

**F.  Plaintiffs D.M. and B.M.**

95.  Plaintiff D.M. is the parent and natural guardian of B.M.

96.  D.M. and B.M. reside in the Southern Local School District in Meigs County, Ohio.

97.  B.M. will be sixteen years old in August, 2005.

98.  B.M. was diagnosed as having attention deficit disorder (ADD) when she was in the third grade.

99.  Southern Local School District did not determine that B.M. was eligible for services under IDEA until she was in seventh grade.

100.  B.M. currently has an IEP and is entitled to a free appropriate public education under IDEIA.

101.  B.M. is provided with classroom accommodations such as additional time to complete work and modified worksheets.

102.  B.M. does not receive any direct instruction from an intervention specialist (special education teacher).

103.  In past years, B.M.'s parents have paid for tutors to assist B.M. with her school work.

104. B.M. has struggled to keep up with her class. Her parents have spent five to six hours per night assisting her with her homework assignments.

105. B.M. is being denied special education services due to the lack of funding in the district.

106. Southern Local has been in fiscal emergency since November 8, 1999.

107. Based upon the FY 2004 Accountability Report, published by the Ohio Department of Education (http://www.ode.state.oh.us/school_finance/PDF/Spec_Ed_Fiscal_Accountability_FY04.pdf) Southern Local School District spent $288,000 less than required for services to students with disabilities under Ohio law.

108. Southern Local is a small district consisting of approximately 720 students of whom 130 are identified as eligible for special education.

109. Because of the district's size and cost efficiencies, the district must rely on collaborative classrooms provided by other entities such as the county education service center or county board of mental retardation for the delivery of special education and related services to some of the students with disabilities in Southern Local.

110. Some students with disabilities must travel lengthy distances to and from these out-of-district classrooms.

111. Because of funding hardships, Southern Local has class sizes that are larger than desired which adversely affects the instructional benefits conferred on the students.

112. The district was required to install an elevator and modify restrooms at the high school building for a student who uses a wheelchair. The cost of the elevator was

$125,000.00 and the state provided no financial assistance to make these modifications.

113. Students in Southern Local are denied access to computer technologies and the internet because of a lack of funding.

**G. Plaintiffs C.S. and S.W.**

114. C.S. is the mother and natural guardian of S.W.

115. S.W. is four years old.

116. C.S. and S.W. are residents of the Washington Courthouse City School District in Fayette County, Ohio.

117. S.W. was born premature and was placed on a ventilator for one month after his birth.

118. S.W. is medically fragile.

119. S.W. has renal hypertension and a neurogenic bladder. He has nephrocalcinosis, which requires that his kidney reflux be monitored. He requires catheterization three to four times per day.

120. S.W. has speech delays, and hypertonia[4] of his extremities.

121. S.W. has been diagnosed with a mild form of Cerebral Palsy and a form of Spina Bifida.

122. Prior to his third birthday, S.W. received early intervention services pursuant to Part C of the Individuals with Disabilities Education Act (IDEA) which is administered by the Ohio Department of Health through its Help Me Grow program.

---

[4] Hypertonia is an increased tightness of muscle tone that can lead to loss of function and deformity if left untreated.

123. S.W. currently receives speech, occupational therapy and physical therapy services which were arranged for by C.S. and paid for with Medicaid funds.

124. In March of 2004, a multi-factored evaluation was done to determine S.W.'s eligibility for special education preschool.

125. In order to be eligible for special education preschool a child must be found to have a documented deficit in one or more of the following areas: communication, vision, hearing, motor skills, social emotional / behavioral functioning, self-help skills and / or cognitive skills.

126. S.W. has documented deficits in one or more of the required areas.

127. S.W. is eligible for and entitled to a free appropriate public education under the IDEIA.

128. However, Washington Courthouse City Schools has determined that S.W. is not eligible for special education preschool.

129. C.S. signed the evaluation report and indicated her disagreement with the school's decision denying S.W. eligibility for special education preschool.

130. Because of his special needs, S.W. would require an aide at preschool.

131. Washington Courthouse Schools has denied S.W. a free appropriate public education.

132. Washington Courthouse has denied S.W. eligibility and services based on the costs of meeting his needs and monitoring his medical and physical conditions.

### H.  Plaintiffs J.G. and M.G.

133.  J.G. is the parent and natural guardian of M.G.

134.  J.G. and M.G. reside in the Whitehall City School District in Franklin County, Ohio.

135.  M.G. is sixteen years old and has cerebral palsy and cognitive impairments. He uses a wheelchair for long distances but primarily walks with support provided by AFO braces. He is receiving botox injections in his legs to improve ambulation.

136.  He is classified by Whitehall City Schools as being orthopedically handicapped.

137.  M.G. has an IEP and is entitled to a free appropriate public education under the IDEIA.

138.  Because of the lack of services for orthopedically handicapped (OH) students in the Whitehall City School District, M.G. has attended school in the Columbus Public Schools for most of his education.

139.  For the 2004-05 school year, Whitehall proposed bringing M.G. back to his home district and J.G. agreed to this placement.

140.  When M.G. attended Columbus Public Schools, he was provided with occupational therapy (OT), physical therapy (PT), adapted physical education (APE) and life skills training to assist M.G. in becoming independent.

141.  M.G. received direct services from the occupational and physical therapists while attending Columbus Public Schools.

142.  Since he began attending Whitehall City Schools, M.G. has been denied PT, except for 2 times per month, consultation services, primarily with the physical education instructor.

143. M.G. has also been denied APE and life skills training because Whitehall does not have these services and has not offered to contract for them.

144. Whitehall City Schools has provided M.G. with OT but the services have been reduced from what he had received in prior years at Columbus Public Schools.

145. Because of M.G.'s cognitive disabilities, he needs small-group or individualized assistance in a larger classroom so that he can be provided with more direct instructional time with his teachers.

146. Because Whitehall City Schools does not have an OH classroom, M.G. was placed in a classroom with students who have learning and other disabilities.

147. The multi-categorical classroom in Whitehall has more students than the OH classroom M.G. attended in Columbus Public. M.G. received more individual attention and one to one instruction when he attended Columbus Public Schools.

148. The students in the Whitehall Schools class room work at a faster pace than M.G. and M.G. has struggled to keep up with the class.

149. M.G. has not met any of his IEP goals for the 2004-05 school year.

150. Whitehall City Schools has refused J.G.'s request for the installation of handrails in the main school building entry, thus M.G. can not use this entrance with the majority of his schoolmates.

151. Whitehall City Schools has denied M.G. necessary special education services and building modifications based on administrative convenience and cost.

152. Because of these denials, J.G. intends to change her domicile to Columbus so that M.G. can attend classes in the Columbus Public School District beginning in the fall of 2005.

## II. DEFENDANTS

### A. State of Ohio

153. Defendant State of Ohio, through the General Assembly, is required to provide a system of public education to all Ohio school children, including children with disabilities, in accordance with the laws and Constitutions of the State of Ohio and the United States.

### B. Governor Taft

154. Defendant Robert Taft is the Governor of the State of Ohio.

155. Under Article III, Section 6 of the Ohio Constitution, he is charged with seeing that the laws are faithfully executed.

156. The Governor is required under O.R.C. Section 107.0 and under the Ohio Constitution, to submit an Executive Budget to the legislature each fiscal biennium.

157. In spite of his awareness of the orders of the Ohio Supreme Court in *DeRolph v. State of Ohio,* 78 Ohio St. 3d 193, 202; 677 N.E.2d 733, 740 (1997) and budget recommendations from Defendant Ohio State Board of Education, Defendant Taft submitted an Executive Budget which failed to provide for a thorough and efficient system of common schools and to provide adequate funding for the provision of a free appropriate public education to plaintiffs and the plaintiff class.

158. Defendant Taft is required to exercise and maintain effective supervision and control over the expenditures of the state.

159. If the Governor determines that the available revenue receipts and balances for the current year will be less than the appropriations for the year, he has the authority to

19

issue orders to the state agencies to prevent their expenditures and incurred

obligations from exceeding the revenue receipts and balances.

160. Defendant Taft has exercised his authority to manage the state budget by reducing

state aid to all Ohio schools due to state budget shortfalls.

161. In March 2003, Defendant Taft signed Executive Order 2003-03T.

162. Executive Order 2003-03T reduced state aid to all Ohio schools by $90.6 million for

the remainder of FY 03.

163. Defendant Taft is sued in his official capacity under the doctrine of *Ex parte Young.*

**C.  Ohio Schools Facilities Commission (OSFC)**

164. Defendant Ohio School Facilities Commission (OSFC) was established in May 1997

as the result of the passage of S.B. 102 (122nd General Assembly).

165. The mission of the OSFC is to provide funding, management oversight, and

technical assistance to Ohio school districts for the construction and renovation of

school facilities in order to create an appropriate learning environment for Ohio's

school children.

166. The Commission's membership is comprised of three voting members: the director

of the Department of Administrative Services, the director of the Office of Budget

and Management, and the State Superintendent of Public Instruction as well as 4

nonvoting members: one member from each political party and from each chamber

of the General Assembly.

**D.  State Superintendent Zelman**

167. Defendant Dr. Susan Zelman is the State Superintendent of Public Instruction for the

State of Ohio. Defendant Zelman is charged with the overall responsibility for the

administration of the laws and regulations governing the operation of Ohio's public schools, including the implementation and operation of school funding in the State.

168.   Defendant Zelman is sued in her official capacity.

**E.   Ohio State Board of Education (OSBE)**

169.   Defendant Ohio State Board of Education (OSBE) is the governing body charged with general supervision of public instruction in the State and having those powers enumerated in O.R.C. Section 3301.07.

**F.   Ohio Department of Education (ODE)**

170.   Defendant Ohio Department of Education (ODE) is the administrative unit and organization through which the policies, directives, and powers of the OSBE are administered. ODE is responsible for ensuring that each eligible student with a disability receives a free appropriate education and is required to exercise its general supervisory responsibility over all public entities which receive federal funds for the education of Ohio students.

**G.   Office for Exceptional Children (OEC)**

171.   Within the ODE is the Office for Exceptional Children (OEC). OEC provides leadership, assistance, and oversight to school districts and other educational entities in the provision of instructional support to students with disabilities.

172.   OEC administers state and federal funds earmarked for children with disabilities, implements a statewide monitoring and complaint resolution system designed to assess district/educational agency compliance with federal and state laws and regulations applicable to children with disabilities; and provides technical assistance

21

to districts and educational agencies around issues of compliance with the Individuals with Disabilities Education Improvement Act.

## H. Office for Early Learning and School Readiness (OELSR)

173. The Office for Early Learning and School Readiness, within the Ohio Department of Education, administers preschool special education programs in Ohio, including allocation of unit funding and monitoring and enforcing special preschool provider compliance with the IDEIA.

**CLASS ACTION ALLEGATIONS**

174. Plaintiffs properly bring this action pursuant to F.R.C.P. 23 (b) (2) and (c) (l) on behalf of themselves and all persons similarly situated. The proposed class is: All children, ages three through 21, currently enrolled or seeking enrollment, now or in the future, in Ohio's public school system, who have a disability under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq., and who require, as a result of their disability, special education and related services or accommodations that are designed to meet individual educational needs of students with disabilities as adequately as the needs of nondisabled children are met, and the parents or guardians of such children. Children who are disabled include those who are mentally retarded, who are hearing impaired or deaf, who have a speech or language impairment, who are blind or otherwise visually impaired, who have a serious emotional disturbance, who have an orthopedic impairment, who are autistic, who have a traumatic brain injury, or who have some other health impairment or specific disability. Children who are disabled also include those who are multihandicapped, who are developmentally handicapped (cognitive disability), who

are severe behavior handicapped (emotional disturbance), who have a specific learning disability, who have attention deficit disorder or hyperactivity disorder, or who have a physical or mental impairment that substantially affects their ability to perform a major life activity.

175. The requirements of Rule 23 (a) are met in that:

    a. The members of this class are definite and ascertainable, but so numerous that joinder of all members is impracticable. The State of Ohio is responsible for identifying all children with disabilities. There are approximately 255,000 school age students with disabilities, comprising approximately 14% of the total school age population. In addition, there are approximately 20,955 special education preschool students receiving services under an IEP in Ohio.

    b. There are questions of law and fact presented in this action that are common to members of the class. All students with disabilities are subject to the same special education funding policies and practices. All students have the right to appropriate educational services and placement in the lease restrictive environment. Common legal questions include: 1) Has the state failed in its duty to properly monitor and enforce the requirements of the Individuals with Disabilities Education Improvement Act? 2) Is the current system of funding special education arbitrary and irrational and does it deny plaintiffs of their rights to educational services in violation of the Equal Protection and Due Process Clauses of the United States Constitution? 3) Does the current

system of funding special education in Ohio result in discrimination based on the disabilities of otherwise qualified students? and 4) Does the current system of funding special education in Ohio adequately provide for a system that ensures that all of the educational needs of all students with disabilities are met?

c. The claims of the named plaintiffs are typical of the claims of the class as a whole. Individually named plaintiffs have been subjected to the state funding policies and practices outlined in this complaint. As a result of these funding policies and practices, they have suffered the same types of deprivation that all students with disabilities have suffered and will continue to suffer.

d. The named plaintiffs will adequately represent the interests of the class. Named plaintiffs have common interests with unnamed members of the class in seeking remedies to address the failures of the defendants to provide an adequate and fair system of funding and providing special education. All students with disabilities are entitled to appropriate services, so the rights of named individuals are not inconsistent with the rights of unnamed individuals. Moreover, the named individuals are represented by attorneys who are well experienced in civil rights and special education litigation.

e. The defendants have acted and refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief

and corresponding declaratory relief with respect to the class as a whole, pursuant to F.R.C.P. 23 (b)(2).

## FACTS

**I. FUNDING**

**A. Special Education Funding For School Age Children**

176. On March 24, 1997, the Ohio Supreme Court held that Ohio's system of funding education violated the "Thorough and Efficient Clause" of the Ohio Constitution. *DeRolph v. State of Ohio,* 78 Ohio St. 3d 193, 202; 677 N.E.2d 733, 740 (1997).

177. In the *DeRolph* decision, the Ohio Supreme Court gave the Ohio General Assembly one year to enact sweeping changes to the education funding system. In response to the *DeRolph* decision, the 122nd Ohio General Assembly enacted H.B. 650 in 1998.

178. H.B. 650 changed the way most special education students are funded by implementing a funding system based upon a formula which counted students with disabilities in the average daily membership (ADM).

179. By counting students with disabilities in the ADM, these students generated basic aid just as regular education students generate basic aid.

180. Under this system, school districts were to receive, in combined state and local funds, the "base cost" (adjusted for the cost of doing business in the county) for each student with disabilities.

181. The amount of state funds provided under the formula is adjusted according to the wealth of the district.

182. In addition to the base amount, H.B. 650 included pupil weights, which provided a separate formula for determining the excess costs for special education and related services based upon three categories of disability.

183. A school district's special education funding was calculated by multiplying the number of students in a particular disability category by the category's statutory weight. That number was then multiplied by the foundation level of funding and the school district's state share percentage to determine the amount of additional funding the district would receive for special education students.

184. In addition to the base cost and additional weighted amounts, additional state subsidies ("catastrophic aid") were available to districts that had certain high cost, low-incident disabilities.

185. Because of concerns that the new weighted system under Am. Sub. 650 was not cost-based, the Ohio Coalition for the Education of Children with Disabilities (OCECD) underwrote a cost-based analysis of special education funding in Ohio.

186. This project resulted in the development of special education funding policy recommendations.

187. In July of 2001 Am. Sub. 94 replaced the earlier two special education weights for three special education categories to six weights for six categories of disabilities.

188. After several revisions of the original bill's special education provisions, Am. H.B. 94 used the general structure for six weights recommended by OCECD, but changed specifics relating to the weights.

189. The OCECD weights were higher than the bill's weights for seven disability groups.

190. The seven disability groups that contain the lowered weights include the vast majority of special education students in Ohio.

191. While OCECD's weights had an empirical basis that was publicly presented, the legislature arbitrarily changed those weights without any articulated justification.[5]

192. The Ohio General Assembly failed to fully fund the special education formula weighted amounts in H.B. 94. In FY 02 the weights were funded at 82.5% of the recommended level and in FY 03 the weights were funded at 87.5% of the recommended level.

193. OCECD's commissioned study found that an additional $103 million was necessary for fully funding the new-cost based weights per year.

194. In Am. H.B. 94, the Ohio General Assembly provided no increase in weighted special education funding for FY02 and only a $20 million increase in FY 03.

195. For the FY 2004-05 budget, the Ohio State Board of Education recommended fully funding of the weights at a cost of $399,0321,944 in FY 04--an additional 26.3% over the FY 03 appropriation—and $431,764,340 in FY 05—an 8.2% increase over the proposed FY04 appropriation.

---

[5] Under Am. H.B. 94 and to date, the special education weights are as follows:
  Category 1: Speech-language handicap is weighted at .2892 over the base amount.
  Category 2: Specific learning disabled, developmentally handicapped (cognitive disability), and other health handicapped-minor are weighted at .3691 over the base amount.
  Category 3: Hearing handicapped, vision impaired, and severe behavior handicapped (emotional disturbance) are weighted at 1.7695 over the base amount.
  Category 4: Orthopedically handicapped and other handicapped-major are weighted at 2.3646 times the base amount.
  Category 5: Multi-handicapped is weighted at 3.1129.
  Category 6: Autism, traumatic brain injury, and deaf-blind are weighted at 4.7342 times the base amount.

196. In response to the State Board of Education request, the Ohio General Assembly failed to fully fund the weighted formula, instead funding the weighted special education formula at 88% in FY 04 and 90% in FY 05.

197. For FY 2006 the State Board of Education recommended that the General Assembly fund the special education weights at 95%, and recommended that the special education weights be increased by 8.3%.

198. For FY 07 the State Board of Education recommended that the General Assembly fund the special education weights at 100% and recommended a 14.5% increase in funding.

199. For FY 2006-2007, Ohio lawmakers again failed to fully fund the weighted formula. For FY 2006 the special education weights are funded at 90%. For FY 2007 the special education weights are funded at 90%. There is no plan to fund the weights at 100%.

200. Poor districts are less able to raise revenue to fund the 10% formula shortfall.

201. The weighted formula for special education does not adjust for inflation.

202. The weighted formula is based on the 1982 version of the Ohio Administrative Code §3301-51 which did not include all services currently mandated for students with disabilities necessary to receive an appropriate education.[6]

203. Because the formula is based on rules that did not include many of these services, the current formula fails to ensure sufficient revenue to school districts to provide

---

[6] Some of the currently mandated services which were not factored into the special education weights include the cost of nursing services; behavior intervention services; personal attendants; social work services; assistive technology devices and services; expert consultants to advise district staff in cases where a student with disabilities has difficult behaviors or unusual needs; transition services beginning at age 16; extended school year (ESY) services (special education services provided to students with disabilities beyond the traditional 180 day school year); medical evaluations as part of the multi-factored evaluation process; independent educational evaluations (IEE) at public expense if parents disagree with an evaluation obtained by the school district.

28

students with disabilities a free appropriate public education, including all necessary related services.

**Limits on Home Instruction Reimbursement**

204. School districts are required to offer a "continuum of alternative placements" to students with disabilities.

205. Home instruction, instruction provided to a student with a disability in the student's home or other community setting in place of instruction provided in the school building, is one placement option on the continuum that must be available to IEP teams when determining the appropriate educational placement for a student with a disability.

206. Home instruction must be available to any student with a disability that requires home instruction, as determined by the IEP team, regardless of the type of disability rendering the student eligible for special education services.

207. Students with disabilities who are placed on home instruction by the IEP team are still entitled to receive and the school district is obligated to provide that student with an appropriate education, including the provision of the amount of instruction necessary for the student to make meaningful progress toward his annual goals and objectives.

208. Home instruction must be provided by qualified professionals.

209. State appropriations for home instruction are limited. School districts can apply for reimbursement from the Ohio Department of Education for part of the cost of providing home instruction only if that instruction is provided to students identified

as having an emotional disturbance, other health impairment, or orthopedic disability.

210. Because some of the students with disabilities who require home instruction have other disability identifications such as multiple disabilities or specific learning disabilities, the state will not reimburse the school district for any of the costs of providing home instruction to these students, even if they are ill and cannot attend school.

211. Additionally, reimbursement is limited to 50% of the cost of home instruction for a maximum of one hour per day.

212. There is a budgetary cap on the amount of funds available to reimburse school districts for the costs of home instruction.

**Catastrophic Aid**

213. School districts may receive additional funds from the state to reimburse for the "catastrophic costs" of high cost special education students.

214. School districts are not eligible for these additional funds until the district meets a threshold amount.  Once that threshold amount is reached, the State funds 100 percent of half the cost above threshold amount, plus the district's state share percentage of the other cost above the threshold amount.

215. In the 2006-07 biennium budget, Ohio lawmakers raised the threshold amount, the amount the districts must spend to trigger eligibility for additional state funds to reimburse districts.

216. In FY 2006 Ohio lawmakers raised the threshold amount from $25,700 to $26,500 for students with disabilities in categories 2 through 5 and from $30,800 to $31,800 for students with disabilities in category 6[7].

217. The Ohio General Assembly allocates a capped amount of funds available to reimburse districts for catastrophic costs.

218. A few high cost students can have a devastating impact on a district's budget and the availability of funds to serve other students.

219. There is no allocation of state funds to assist districts with the amount above the amount provided by the special education weighted formula but before the threshold amount is reached.

**Overidentification and Misidentification**

220. Under the current weighted per pupil method, school districts receive more money for children identified as having disabilities than children who are not identified as being disabled.

221. Under the current weighted per pupil method, school districts receive more money for children identified as having more severe disabilities.

222. Since the special education funding methodology was changed to a weighted per pupil system there has been an increase in the numbers and percentages of Ohio school children labeled as disabled and as having higher weighted disabilities.

223. Children with more severe disabilities generally are educated in a more restrictive environment than children who are mildly disabled.

---

[7] See footnote 5.

224.   Children who are placed in a more restrictive environment than necessary because of misidentification are denied FAPE.

225.   Children identified as more severely disabled generally spend more time away from the general education environment than children labeled with less severe disabilities.

226.   In Ohio, children who are identified as having Multiple Disabilities or Emotional Disturbance are more likely than other disability groups to be placed in restrictive settings and have less access to the general education curriculum.

227.   Students, including students with disabilities, have left public school districts to attend community schools.

228.   In Ohio, public charter schools are referred to as "community schools."

229.   Some community schools have identified these students as having disabilities when the public school had not identified them as being eligible for special education.

230.   Some community schools have identified students who were identified by the public school as having a disability but the community school has identified them as having more severe disabilities than previously determined by the public school district. This new category of eligibility is frequently a category with a higher weight amount associated with it.

**Funding to Address Physical Accessibility**

231.   Students with physical disabilities must be provided access to all programs of a school district.

232.   The weighted special education formula does not factor in the costs of modifications of and adaptations to physical facilities serving Ohio school children with physical disabilities.

233. Because of the lack of state funds to address physical accessibility, children with disabilities are frequently denied the benefits of programs and activities offered by schools and are subject to discrimination on the basis of their disabilities.

**Waivers of State Operating Standards**

234. In 2001 ODE promulgated rules implementing the IDEA. Those rules place restrictions on the maximum number of students with disabilities that can be served at one time in a classroom (ratio), the number of children with disabilities that can be served by a special education teacher or related service provider (caseload), and the age range of students with disabilities served in a classroom at one time.

235. ODE allows school districts to circumvent the ratio, caseload and age range requirements in ODE's administrative rules by granting multiple waivers for one school district in a school year and allowing those waivers to be renewed for more than one year.

236. When a school district submits a waiver application, ODE does not request any supporting documentation to show that the district has made adequate attempts to prevent the need for a waiver and does not require supporting documentation to show that the district has a viable plan for rectifying the situation giving rise to the need for a waiver.

237. There is a shortage of particular types of related service personnel and special education teachers in Ohio.

238. Inadequate funding for special education prevents districts from offering competitive salaries to attract special education teachers and related service personnel.

239. School districts use the waiver process when they have inadequate staffing or space.

240. Waivers have an adverse impact on students with disabilities because they result children with disabilities are not receiving appropriate levels of services.

**Reductions in Community Alternative Funding System (CAFS)**

241. Prior to June 30, 2005, Ohio school districts received approximately $67 million annually to provide services to needy school children who qualify for Medicaid.

242. The school districts received this funding through the Community Alternative Funding System (CAFS)

243. School Districts that received these funds routinely used them to provide related services to students with disabilities.

244. The Ohio Department of Jobs and Family Services (ODJFS) which administered this program decided to terminate it on June 30, 2005.

245. A number of school districts filed a lawsuit seeking to continue the CAFS funding.

246. A settlement was reached in the case which does not restore the full level of funding to Ohio school districts.

247. The settlement is estimated to provide only one third of the funding provided to school districts prior to June 30, 2005.

248. As a result, school districts that received Medicaid funding under CAFS will have to cut services to students with disabilities ages three through twenty-one or use additional local funds to continue providing the same level of services.

**B. Special Education Funding for Preschool Children**

249. The State of Ohio is obligated to provide preschool special education services for all eligible children with disabilities ages 3 through 5 in Ohio.

250. The majority of state funds for preschool special education are distributed to school districts in the form of funding for "units" for preschool special education services. District eligibility for preschool special education unit funding is based on having the requisite number of students identified as disabled.

251. The State of Ohio provides funds for preschool special education programs and services through a "unit funding" mechanism whereby funds are allocated to the school districts in accordance with a formula that includes teacher compensation based on the state minimum teachers' salary schedule, 15% of that minimum salary to cover retirement and all other fringe benefits, and a fixed amount for all other expenses.  For classroom units, the fixed amount is about $8,000 and for related services unit the fixed amount is about $2,000.

252. This formula does not provide state funding for the full cost of operating a unit.

253. Districts must use local and federal funds to make up the difference between what the state funds and what the services actually cost.

254. The state minimum salary scheduled has not increased each year to keep pace with increasing costs.

255. Distribution of state funds for preschool special education must stay within the appropriation specified for that line item.

256. Eligibility for state support for a classroom or a related service special education unit requires a minimum number of children within a specific age range.

257. If a district has fewer than the full number of required children, the "unit" will receive only a proportionate share of the full formula.  When a full unit is not funded, the district must make up the difference with local dollars.

258. In determining eligibility for unit funding, school districts may only count children who are at least three years old, but less than six years old, by December 1.

259. Throughout the school year, students with disabilities reach three years of age and, upon their third birthday, become eligible for special education services and a free appropriate public education.

260. Children who turn three years of age after December 1 are not included in the child count submitted to Ohio Department of Education for purposes of calculating eligibility for preschool special education unit funding, even though those children must be served by the district.

261. The number of preschool special education units is authorized by the General Assembly in each biennial education budget.

262. The State of Ohio has consistently funded fewer units than identified as needed and as requested by Ohio school districts and by the Ohio State Board of Education.

263. The Ohio General Assembly does not provide enough funds to provide unit funding for each of the preschool special education units in operation in the state.

264. Approximately 3294 preschool special education units were in operation during the 2004-2005 school year.

265. Approximately 650 units were operated without state support during the 2004-2005 school year.

266. There are more applications for state funding of special education units than the number of units authorized by the Ohio General Assembly.  In order to apply for funding for a special education unit, a school district must first provide (without any

guarantee of funding) the program and services that would qualify the unit for state special education funds.

267. The Ohio Department of Education determines the number and types of state funded preschool special education units to be allocated to school districts in any year based on the total number of units authorized and funded by the Ohio General Assembly.

268. Districts having the minimum number of pupils to qualify for a funded preschool special education unit and that have had such a unit in the previous year automatically receive a funded unit of the same type in a subsequent year.

269. The number of children with disabilities in a district directly determines the number of units for which a district may apply.

270. The scheme by which Ohio distributes the state funds appropriated each biennium results in under-funding and inequitable funding for special education.

271. The method of calculation for state approved preschool special education unit funding education is not equalized based on the wealth of the district.

272. The local share of costs for educating students with disabilities varies significantly from school district to school district depending upon the numbers of children with disabilities enrolled in the district and upon the local property wealth.

273. Unit funding adversely impacts children with disabilities in smaller and poorer school districts to a greater degree than students in larger and wealthier school districts.

274. The current funding formula of preschool special education allows larger, urban districts to receive more units than small, rural districts. Smaller districts do not have sufficient student counts to generate a full unit.

275. Small school district must form cooperative arrangements with other districts to provide services.

276. As a result of this funding scheme, the "least restrictive environment" in a small, rural district is not the same as the "least restrictive environment" in a larger, more urban school district.

277. School districts with sufficient local funds can fund units and "wait and see" if the State can fund the units. School districts with fewer local funds cannot afford to take this risk. As a result, students with similar disabilities can receive fundamentally different level of services.

278. These inequities in funding result in inadequate services which deny preschool special education students with disabilities a free appropriate public education as required by law.

279. Under-funding and inequitable funding for special education result in school districts' inability to comply with federal and state law requirements for special education.

280. Because of the inadequacy of the funding available for preschool special education programs, many school districts rely on the local county boards of mental retardation and developmental disabilities or on educational service centers (ESC) to provide preschool special education programs.

281. County board of MR/DD placements are generally more restrictive placements than placements offered in public schools and tend to segregate children with disabilities from typically developing peers.

282. Some children who are placed out of district must endure lengthy bus rides which can be tiring for children who are medically or emotionally fragile.

283. Children who are transported out of district sometimes receive less time in school than typical peers.

284. When local programs are unavailable, the services identified as needed and delivered to students with disabilities depends upon the numbers of children and the numbers of available service providers instead of upon the actual unique needs of each student with a disability.

## C. General Education Funding Issues Which Impact Students With Disabilities

285. The Ohio General Assembly has failed to enact a complete and systemic overhaul of school funding as ordered by Ohio's Supreme Court in the *DeRolph* decisions.

286. The Supreme Court of Ohio will take no further action to enforce its orders to implement a complete and systemic overhaul of Ohio's school funding system.

287. Since the Ohio Supreme Court released jurisdiction of *DeRolph* in the spring of 2003, state funding increases have tapered off.

288. H.B. 66 provides no increases to approximately one third of Ohio districts in FY06.

289. According to the Legislative Service Commission June 21, 2005 side by side comparison, overall SF-3 funding for school districts increases by approximately 2.3% in FY 2006 and 2.1% in FY 2007.

290. That increase will not cover the rising cost of insurance, fuel, and utilities.

291. Significant changes to other factors in the formula greatly shift funding to property owners and farmers.

292. Contrary to the dictates of *DeRolph*, there continues to be an over-reliance on local property taxes as the primary method of funding Ohio schools.

293. According to Dr. Zelman's budget testimony of February 15, 2005, over the past five years, the number of local school operating levy requests rose from 218 to 427 while voter approval of levy requests declined from 70% to 43%.

294. The statewide average local share for school funding remains higher than the state share.

295. According to Dr. Zelman's February 15, 2005 budget testimony, the list of Ohio's financially troubled school districts is growing.

296. Also according to Dr. Zelman's testimony, the number of school districts in Fiscal Caution increased from 2 to 16, the number in Fiscal Watch went from 4 to 13 and the number in Fiscal Emergency increased from 3 to 8.

297. According to Chapter 3316 of the O.R.C., Fiscal Emergency must be declared if the State Auditor certifies a general fund deficit for the current fiscal year exceeding 15% of the district's prior year operating revenue.

298. There are additional conditions under which Fiscal Emergency may be declared.

299. If a school district in placed in Fiscal Emergency, it can apply for an advance from the state's Solvency Assistance Fund.

300. This fund provides an advance to the district of the district's state foundation payments.

301. This advance must be approved by the State Controlling Board and repayment of the advance starts in the next fiscal year.

302. The payment advance from the Shared Resource Account of the Solvency Assistance Fund perpetuates the same borrowing pattern that led its predecessor to be held contrary to the State's mandated "thorough and efficient system" of education and is therefore, unconstitutional. *DeRolph v. State* (2001), 93 Ohio St.3d 309, 350.

303. Under the Solvency Assistance Fund school districts continue to borrow to provide funding for daily expenses although now the borrowing is performed interest free.

304. O.R.C. 5705.391 requires a board of education to file a five-year forecast at least twice a year with the Ohio Department of Education (ODE).

305. ODE is required to analyze the forecasts to determine whether a district has the potential to incur a deficit during the first three years of the five year forecast.

306. Once a district has the potential to incur a deficit, the district is to be notified and to take immediate steps to avoid the projected deficit.

307. According to Dr. Zelman's testimony, 250 school districts are projecting deficits or low funds balances.

308. In order to avoid deficits or low funds balances, school districts must reduce expenditures or increase revenues.

309. At the same time, Ohio school districts are experiencing increasing costs that are not adequately addressed in H.B. 66.

310. These increasing costs include rising costs for healthcare, insurance, transportation and increasing salaries for teaching and non-teaching staff.

311. Absent reductions in staff or an influx of additional money the deficit of a financially troubled district would increase.

312. Because the state budget does not provide increases for some districts and only small increases for other districts, these districts frequently make cuts in instructional staff.

313. As a result of inadequate funding, school districts have laid off thousands of teachers in the past year.

314. The Ohio General Assembly has failed to remedy structural deficiencies in the basic aid formula in violation of the dictates of the *DeRolph* decision.

315. The formula ADM is no longer the greater of the current year or three year average.

316. If a district has declining enrollment, the use of current year enrollment decreases the amount of funds the district would receive from the state.

317. The cost of doing business factor (CODBF) was included in the school funding formula to reflect differences in costs from county to county across the state.

318. Prior to H.B. 66, the CODBF was a range of 1 to 7.5.

319. H.B. 66 phases the CODBF down to a 5.0% range in FY 2006 and a 2.5% range in FY 2007.

320. The effect of phasing down the CODBF is that some school districts will receive less funding.

321. Phantom revenue occurs when the tax base of a school district increases through inflation, through reappraisals or updates of property values.

322. An increase in property valuation does not result in an increase in local revenue for the district because H.B. 920 holds revenue constant following a reappraisal or update.

323. Phantom revenue results in schools receiving less state aid because of an increase in the charge-off or "gap aid" and an assumed increase in wealth.

324. The charge-off supplement is intended to fill the gap between what districts raise locally and what their foundation formula assumes is their share of formula aid, weighted special education aid, career technical education aid and transportation aid. (O.R.C. 3317.0216).

325. The Ohio General Assembly has failed to eliminate phantom revenue in violation of the dictates of the *DeRolph* decision.

326. Acceleration of the phase out of the tangible personal property tax results in a shift in local property tax burden from business taxpayers to the residents and farmers in the district.

327. The Ohio State Board of Education continues to make budget recommendations based on political viability and not based on the actual costs of providing students, including students with disabilities, an adequate education.

328. The Ohio General Assembly continues to enact education budgets that do not fully fund the costs of providing a thorough and efficient system of common schools.

**Impact of Funding for Community Schools**

329. Ohio has more than 260 community schools serving approximately 63,000 students.

330. Community schools are funded on a per-pupil full-time equivalent (FTE) basis.

331. Foundation funding for community schools consists of:

    a.  Formula Amount (for Fiscal Year '05 that amount is $5169)

    b.  D.P.I.A. Amount

    c.  Special Education Weighted Amount

    d.  Parity Aid

    e.  Gifted Units

f.   Career-Technical and Adult Weighted Funding

332.   The per-pupil amount is the formula amount times the cost of doing business factor

of the student's resident district times the FTE.

333.   The per pupil amount (state and local shares) is deducted from the resident school

district.

334.   Over $300,000,000.00 has been deducted in FY05 from Ohio public school districts

for the funding of all students transferring to community schools.

335.   School districts' expenses are not proportionately reduced when a student transfers to

a community school.

336.   The loss of funds due to the community school deduction adversely affects the

ability of school districts to meet the needs of all students, including students with

disabilities, who remain in the school district.

337.   The deduction from school districts is greater than the amount which districts receive

in state funding for the special education weighted calculation.

338.   The full special education weighted amount ranges from $1,149 per pupil to $18,802

per pupil in FY05 depending on the severity of the student's disability.[8]

339.   School districts receive the state share percentage of the special education weighted

amount which ranges from no state funding to approximately 80% state funding.

340.   The full weighted amount is deducted from the resident district for each community

school student.

---

[8] From SBOE Budget recommendations for FY06-07.

**Impact of Vouchers**

341.  The Educational Choice Scholarship Pilot Program, a voucher program, provides money for students attending school buildings that have been in academic emergency for three consecutive school years, including community school students who otherwise would attend school in those school buildings, to attend chartered non-public schools.

342.  For FY 2007, the scholarship provides the lesser amount of the actual tuition of the chartered non-public school or $4,250 for students in grades kindergarten through eight and $5,000 for students in grades nine through twelve.  Ohio lawmakers created 14,000 scholarships under this program for FY 2007.

343.  Governor Taft recommended the allocation of 9 million dollars for the voucher program.  However, Ohio lawmakers did not allocate specific dollars to fund the scholarship.  Instead, eligible students who receive a scholarship are counted in the average daily membership (ADM) of their school district of residence.  For FY 2007, $5,200 is then deducted from the state share of the school district of residence by the Ohio Department of Education.

344.  The amount of the scholarship increases each year by the same percentage that the base-cost formula increases.

345.  In the 2006-07 Biennium Budget, Ohio lawmakers allocated $675,000 in FY 2006 and $500,000 in FY 2007 for the administration of the scholarship program.

346. A second voucher program available in Ohio is the Cleveland Scholarship Program. The Cleveland Scholarship program provides vouchers to students for tuition and for tutorial assistance.

347. Ohio lawmakers expanded the Cleveland Scholarship Program in the 2006-07 budget by extending the availability of the scholarship to eleventh and twelfth graders who received scholarships the previous year.

348. Ohio lawmakers also increased the base scholarship amount. Prior to 2007, the scholarship provided eligible students in grades K-8 $3000 and in grades 9-10 $2,700. In 2007, eligible students in grades K-12 are provided $3,450.

349. The Cleveland Scholarship Program also includes a tutorial assistance grant for students in grades K-12. The maximum amount of that grant was set at $400 per student starting in 2007. Prior to 2007, the maximum amount was 20% of the base scholarship amount.

350. The Cleveland Scholarship Program is funded by subtracting the amount of the base scholarship amount and tutorial assistance grant amount from the state share of funding for the district of residence of each student who receives a scholarship under this program.

## II.  STATE OF OHIO'S GENERAL SUPERVISORY AUTHORITY FOR SPECIAL EDUCATION

### A.  Focused Monitoring

351.  Ohio's focused monitoring system has been in effect since the 2003-2004 school year.

352.  Under the focused monitoring system, the Ohio Department of Education focuses monitoring on a select number of districts and a select number of IDEIA compliance issues.

353.  ODE uses information collected through its education management information system (EMIS), a system for tracking information about districts and students, including students with disabilities, and through the state accountability system to determine what districts to target for focused monitoring.

354.  EMIS tracks information relevant to students with disabilities, including, but not limited to, the disability eligibility category by district, the placement of those students, the types of related services those students receive, and the amount of time those students spend in the regular education classroom.

355.  EMIS and accountability data are used to rank districts based on specific performance indicators.  Those districts that rank lowest on performance indicators may be targeted for focused monitoring.

356.  There are approximately 900 educational entities, including 612 traditional school districts and 250 community schools, in Ohio.

357.  In 2003-2004, ODE monitored ten school districts in the first year of the focused monitoring system.

358. ODE does not subject all educational entities to focused monitoring even if they fail to meet state and federal standards.

359. For those agencies that are monitored any incremental improvement may be deemed by ODE to meet compliance even if students with disabilities are not meeting the state's proficiency goals.

360. ODE's focused monitoring system does not address individual student denials of FAPE.

361. ODE's focused monitoring system does not ensure correction of non-compliance within a one year period.

362. ODE's focused monitoring system has no mechanism to provide additional funding if needed for the agency to come into compliance with IDEIA.

363. ODE's focused monitoring system uses a self review process.

364. The self-review process is not sufficiently validated by ODE.

365. ODE's focused monitoring system includes no benchmarks for some of the priority areas, such as the least restrictive environment and disciplinary removals.

366. A significant number of students with disabilities ages 3-21 in Ohio receive services from a county board of MR/DD.

367. County boards of MR/DD are not currently reporting information to EMIS.

368. For school-age students with disabilities, the students' school district of residence must be relied upon to provide that information.

369. For preschool children receiving special education preschool services from the county board of MR/DD, information about those children is not provided to EMIS at all. County boards of MR/DD providing preschool special education services

provide limited information through a separate web-based application to the Ohio Department of Education, Office for Early Learning and School Readiness.

370. By not collecting data directly through EMIS, the amount and accuracy of information available to ODE for monitoring and enforcement of IDEIA is limited.

## B. Complaints

371. As part of the state's general supervisory responsibilities under IDEIA, ODE operates a complaint system under which any person having knowledge of a violation of IDEIA can make a formal written complaint to ODE.

372. OEC conducts an investigation of the complaint and issues a letter of findings which sets forth the issues and whether the district is in or out of compliance with the IDEIA and state operating standards for special education.

373. If OEC determines that a district is out of compliance, it will issue a corrective action plan which the district must complete.

374. When the corrective action has been completed, OEC closes the complaint.

375. OEC also issues complaint closure letters when it determines that the issue raised is, in its view, not an issue that is properly a subject of the complaint process.

376. OEC's complaint process does not address failure of a school district to confer FAPE unless there is also a procedural violation.

377. OEC's complaint process does not address funding problems, even when the lack of funds results in the denial of a FAPE in the LRE

378. OECs complaint process does not address what OEC characterizes as 504/ADA violations.

379.  OEC's complaint process does not address a school district's failure or refusal to identify students as being eligible for special education.

380.  OEC's complaint process does not address repeat and systemic violations by a school district.

**C.  Sanctions**

381.  ODE and OEC fail to impose adequate sanctions to address repeated failures by districts to comply with corrective action plans in response to complaint findings, and in response to focused monitoring.

**D.  OSEP Findings**

382.  The United States Department of Education, Office for Special Education Programs (OSEP) monitors states' compliance with the IDEIA.

383.   During OSEP's 1999 compliance visit to Ohio, OSEP founded Ohio to be out of compliance in a number of areas including monitoring, the complaint system and LRE.

384.  According to OSEP, one method of enforcement consists of issuing special condition letters for its grant awards.  These letters place a state's federal funds at risk, although funds have not generally been withheld.

385.  Ohio has been placed on conditional approval by OSEP since OSEP's 1999 monitoring visit and, according to OSEP, Ohio has not achieved full compliance with IDEIA.

## CAUSES OF ACTION

## I. FIRST CAUSE OF ACTION - IDEIA

386. Plaintiffs and the Plaintiff class restate and incorporate by reference each of the allegations of paragraphs 1 through 385 of this complaint as if fully rewritten herein.

387. Defendant State of Ohio is responsible for ensuring the provision of and funding for a free appropriate public education for all eligible children ages three through twenty-one in the least restrictive environment (LRE) according to the Individuals with Disabilities Education Improvement Act (IDEIA), 20 U.S.C. §1400 *et seq.* and Ohio Revised Code Chapter 3323.

388. A free, appropriate public education must be provided in the least restrictive environment, individually tailored to meet the unique needs of each child with a disability and documented in each child's written Individualized Education Program (IEP).

389. Defendants ODE, OEC, and OELSR are ultimately responsible for ensuring that each agency in the state is in compliance with the IEP requirements and the other provisions of the IDEIA.

390. If the local educational agency is unwilling or unable to comply with the Act, ODE must provide services directly to the student.

391. The IDEIA requires state education agencies to monitor and enforce compliance of local public agencies with federal and state special education laws.

392. State education agencies are also required under IDEIA to operate an effective complaint system to respond to allegations of violations of IDEIA committed by local educational agencies.

393. The system of funding in provision of educational services to students with disabilities in the State of Ohio as described in this complaint, and the actions and inactions of defendants State of Ohio, Ohio Department of Education, Office for Exceptional Children, and Office for Early Learning and School Readiness have resulted in the failure to provide adequate or sufficient revenue to enable students with disabilities to receive a free appropriate public education and related services in the least restrictive environment as required by 20 U.S.C. § 1400, *et seq.*, implementing federal regulations 34 C.F.R. Part 300 and as implemented by Ohio Revised Code Chapter 3323.

394. By not providing full funding of the special education formula, the State is in violation of IDEIA's non-supplantation requirements and is at risk of loss of IDEIA funds.

395. Defendants have also failed in their statutory duties to assure and monitor compliance with these laws and to operate an effective complaint system as articulated by 20 U.S.C. § 1400, *et seq.*, implementing federal regulations 34 C.F.R. Part 300 and as implemented by Ohio Revised Code Chapter 3323.

## II. SECOND CAUSE OF ACTION – SECTION 504

396. Plaintiff and the plaintiff class incorporate by this reference paragraphs 1 through 395 of the complaint as if fully rewritten herein.

397. Defendants State of Ohio, OSFC and ODE are recipients of federal funds and must provide services in a manner which does not discriminate against people with disabilities.

52

398. Each plaintiff and class member is an "individual with handicaps" as defined in §
706(8).

399. Each of the plaintiffs and the class members is an "otherwise qualified person." They
are all individuals who have disabilities and are entitled to receive a free appropriate
public education.

400. Defendants provide financial support in whole or in part to subgrantees, i.e., local
school districts, to provide services and facilities to students with disabilities.

401. The system of funding and the provision of services and facilities to plaintiffs and
the plaintiff class as described in this complaint and the actions and inactions of
defendants result in the denial of benefits of, exclusion from participation in
programs or activities for which they are otherwise qualified, and otherwise being
discriminated against on the basis of plaintiffs' and the plaintiff class' disabilities in
violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 and
implementing regulations.[9]

## III.  THIRD CAUSE OF ACTION – DUE PROCESS – STATE CREATED INTERESTS

402. Plaintiff and the plaintiff class incorporate by this reference paragraphs 1 through
401 of the complaint as if fully rewritten herein.

403. Section 2, Article IV of the Ohio Constitution mandates a thorough and efficient
system of common schools throughout the state.

404. This duty has been determined by the Courts of Ohio to be a mandatory duty
imposed on these defendants.

405. This duty creates a property interest on behalf of the plaintiffs and the plaintiff class.

---

[9] Plaintiffs acknowledge this Court's ruling on July 9, 2004 (Docket # 89) and include this cause of action to
preserve the claim for further review.

406. This duty creates a liberty interest on behalf of the plaintiffs and the plaintiff class.

407. Funding for services to these plaintiffs and the plaintiff class is determined, in the first instance, under this duty which applies to all students in Ohio.

408. The current funding system used by defendants Taft and Zelman to provide for public schools does not meet this duty.

409. In particular, the current system continues to feature these and other characteristics that Ohio courts have found violate the duty of the state under Section 2, Article IV:

   a. Over- reliance on local property tax as a school funding source;

   b. Phantom revenue, a circumstance by which a school district appears to be more wealthy to the school funding formulae than it actually is;

   c. School districts must borrow funds to maintain current operations;

   d. School districts are required to impose reductions in staffing and educational programs in order to balance local school district budgets, which results in diminished educational opportunities for pupils, reductions in educational equipment and supplies, reductions in levels of support staff and reductions in building maintenance; and

   e. Pupils are required to attend school in buildings that are not handicap accessible and which do not satisfy applicable health and safety codes.

410. Plaintiffs bring this action under 42 U.S.C. § 1983 because Defendants Taft and Zelman, under color of state law, have failed to comply with this duty, and the denial of access to the courts of Ohio to seek redress for this failure, deprives plaintiffs and the plaintiff class of the protected liberty and property interest without due process of law, and violates the Due Process Clause of the Fourteenth Amendment

## IV. FOURTH CAUSE OF ACTION – DUE PROCESS – ACCESS TO COURTS

411. Plaintiffs restate and incorporate by reference each of the allegations of paragraphs 1 through 410 of this complaint as if fully rewritten herein.

412. The Supreme Court of Ohio has determined that it is without jurisdiction to enforce the duty established by the Ohio Constitution, Section 2, Article IV, and has prohibited the state's lower courts from enforcing the mandatory duty created by this section. The denial of access to the courts of Ohio to seek redress for this failure, deprives plaintiffs and the plaintiff class of a protected liberty and property interest without due process of law, and violates the Due Process Clause of the Fourteenth Amendment.

413. Plaintiffs bring this action under 42 U.S.C. § 1983 because Defendants Taft and Zelman, under color of state law, have acted and failed to act in a manner that has created the system of funding and provision of services to students with disabilities in the State of Ohio as described in this complaint which denies students with disabilities their state and federal constitutional rights of equal protection of the law pursuant to the United States Constitution.

## V. FIFTH CAUSE OF ACTION –EQUAL PROTECTION – STATE CREATED INTERESTS

414. Plaintiff and the plaintiff class incorporate by this reference paragraphs 1 through 413 of the complaint as if fully rewritten herein.

415. The failure of these defendants to comply with their mandatory duty under the Ohio Constitution, Section 2, Article IV, has created a grossly disproportionate disparity in funding among local school districts.

55

416. This disparity is based on arbitrary classifications related to a district's ability to levy property taxes on its citizens, as well as the native wealth of those citizens and the value of the tax base in that district.

417. As a result, pupils receive differing, and often inadequate levels of educational opportunity from district-to-district as reflected by school and building report cards and disparities in graduation rates and proficiency test passage rates.

418. This disparity has harmed plaintiffs and the plaintiff class in that, particularly in less well funded school districts, children with disabilities with identified needs for special education services are denied such services.

419. Further, children with disabilities in less well funded districts are less likely to be identified as in need of special education services.

420. Plaintiffs bring this action under 42 U.S.C. § 1983 because Defendants Taft and Zelman, under color of state law, have failed to provide for funding for educational services in a manner that is rational and not based on arbitrary and random factors which violates the right to equal protection guaranteed to Plaintiffs and the plaintiff class by the 14th Amendment to the United States Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

A.  That the system of funding and providing services to students with disabilities be declared illegal as in violation of the Equal Protection and Due Process clauses of the United States Constitution and 29 U.S.C. § 794; 20 U.S.C. § § 1401, *et seq.* and; 29 U.S.C. § 794.

B.  That the Court enjoin the Defendants from failing to provide for, fund, monitor, and enforce a system of services to students with disabilities that complies with the requirements of the above laws as declared by this Court;

C.  That the Court award plaintiffs' attorneys' fees and costs in bringing this action;

D.  That the Court award such other relief as it deems equitable and proper;

E.  That the Court retain jurisdiction of this matter for the purpose of assuring compliance with its findings and orders.

Respectfully submitted,

/s/ Susan G. Tobin

Susan G. Tobin, Trial Attorney 0021725

/s/ Michael Kirkman

Michael Kirkman, Of Counsel (0009854)

/s/ Vanessa K. Coterel

Vanessa K. Coterel, Of Counsel (0076043)

Attorneys for the Plaintiffs and Plaintiff Class
Ohio Legal Rights Service
8 East Long Street, Suite 500
Columbus, Ohio 43215-2999
(614) 466-7264
Fax (614) 644-1888

<u>Certificate of Service</u>

This certifies that on July 29, 2005, a true copy of Plaintiffs' Amended Class Action Complaint was filed electronically.   Notice of this filing will be sent to all registered parties by operation of the Court's electronic filing system.

/s/ Susan G. Tobin

Susan G. Tobin, Trial Attorney 0021725)