## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| B.H., a minor, by and through his parent, D.H.; | : | |
| | : | |
| **and** | : | Case No.: 2:91-cv-00464 |
| | : | |
| C.M.U., a minor, by and through his parent, C.S.U. | : | Judge Watson |
| | : | Magistrate Judge Kemp |
| **and** | : | |
| | : | |
| C.S., a minor, by and through his parent, A.S.; | : | |
| | : | PLAINTIFFS' THIRD AMENDED |
| **and** | : | CLASS ACTION COMPLAINT |
| | : | FOR DECLARATORY |
| L.J., a minor, by and through her parents, Mr. and Mrs. J.; | : | AND INJUNCTIVE RELIEF |
| | : | |
| **and** | : | |
| | : | |
| Z.D., a minor, by and through his parents, S.D. and G.D.; | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | |
| | : | |
| State of Ohio; | : | |
| | : | |
| **and** | : | |
| | : | |
| John Kasich, in his official capacity as Governor of the State of Ohio; | : | |
| | : | |
| **and** | : | |
| | : | |
| Richard Ross, in his official capacity as the State Superintendent of Public Instruction; | : | |
| | : | |
| **and** | : | |

**The Ohio State Board of Education;**      **:**

     **and**                              **:**

**The Ohio Department of Education;**      **:**

     **Defendants.**                    **:**

---

## PLAINTIFFS' THIRD AMENDED CLASS ACTION COMPLAINT
## FOR DECLARATORY AND INJUNCTIVE RELIEF

### JURISDICTION AND VENUE

1.　　Jurisdiction is conferred on this Court by 28 U.S.C. § 1343(3), which gives United States District Courts original jurisdiction in suits to provide relief for the deprivation of civil rights under color of state law.

2.　　Jurisdiction is conferred on this Court by 28 U.S.C. § 1331, which gives United States District Courts original jurisdiction in suits arising under the Constitution or laws of the United States and against defendants acting under color of state law, pursuant to 42 U.S.C. § 1983.

3.　　Authority to grant declaratory, injunctive or other proper relief is conferred on this Court by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

4.　　Venue in this district is proper under 28 U.S.C. § 1391(b).

### INDIVIDUAL FACTUAL ALLEGATIONS

## II.　INTRODUCTION

5.　　Named plaintiffs and plaintiff class members are parents and their children who are students with disabilities.  These students are eligible for and entitled to a free appropriate public education (FAPE) with students who do not have disabilities to the maximum extent

appropriate (least restrictive environment or "LRE") under the Individuals with Disabilities Education Act ("IDEA"); 20 U.S.C. §§ 1401, *et seq.*

6.      The current school funding scheme in Ohio has resulted in and will continue to result in systemic denials of FAPE to named plaintiffs and the plaintiff class.

7.      In addition to violating the IDEA, defendants' failures or refusals to provide adequate funding for special education violates Section 504 of the Rehabilitation Act of 1973.

## III.      NAMED PLAINTIFFS

### Plaintiffs D.H. and B.H.

8.      B.H. is seven years old and resides with his mother, D.H. in the Shaker Heights City School District.

9.      At age eighteen months, B.H. received a diagnosis of Autism Spectrum/Pervasive Developmental Disorder, Not Otherwise Specified.

10.     At the time, B.H. was residing in the Cleveland Heights-University Heights City School District ("CHUH").

11.     B.H. has delays in development, including deficits in language and socialization.

12.     B.H. received home-based IDEA, Part C early intervention services beginning on January 24, 2008.

13.     B.H. attended a center-based early intervention program four days per week through the Cuyahoga County Board of Developmental Disabilities between August of 2008 and May of 2009 until the program was cut.

14.     During the first three months of the 2009-2010 school year, B.H. attended another center-based program for two days per week through the Cuyahoga County Board of Developmental Disabilities until he was determined ineligible due to his age.

15.     B.H. also participated in a toddler speech group at Cleveland Hearing and Speech Center for two months, private speech/language therapy and private occupational therapy through the Cuyahoga County Board of Developmental Disabilities, a responsive teaching (play therapy) program, and a home program.

16.     B.H. also received speech/language and occupational therapies paid for through his insurance and through D.H.'s funds.

17.     When B.H. turned three in November, 2009, D.H. sought to enroll him in CHUH's preschool.

18.     CHUH completed the Evaluation Team Report on November 9, 2009 and concluded that B.H. was not eligible for special education preschool.

19.     D.H. then sought to enroll B.H. as a regular education preschool student.

20.     CHUH refused to enroll B.H. as a regular education student because he was not toilet trained.

21.     D.H. requested that CHUH enroll B.H. and provide a modification of the toilet training requirement as an accommodation or modification under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act.

22.     In March, 2010, D.H. received a message from CHUH to register her son; however, there was a waiting list and he was second on the list.

23.     In April, D.H. learned that B.H. was "pretty far down" on the waiting list because other students had advanced on the waiting list ahead of B.H. because of the toilet training issue and, in any event, no admissions would be made this late in the year.

24.     B.H. did not receive any services during the 2009-2010 school year.

25.     Since B.H. was denied enrollment in the public preschool, D.H. enrolled him in a private program at the Montessori School, which agreed to waive the toilet-training requirement.

26.     D.H. requested an Independent Educational Evaluation (IEE), which was completed in May 2010.

27.     The IEE concluded that B.H. has deficits in adaptive behaviors, with his performance considered moderately to significantly impaired in the areas of communication, daily living skills and socialization.  The IEE encouraged the school district to implement an Individualized Educational Program ("IEP") to target these weaknesses and made specific IEP recommendations.

28.     The IEE concluded that B.H.'s current private program at the Montessori School was inappropriate given limited opportunities to target B.H.'s weaknesses.

29.     The IEE recommended 1:1 language therapy which incorporates the principles of Applied Behavior Analysis ("ABA"), a research-based, intensive discreet trial training program for children with Autism Spectrum Disorder.

30.     D.H. secured some services recommended in the IEE through private providers to provide ABA services since B.H. was not receiving them from CHUH.  The Montessori School would not allow B.H.'s ABA tutors to provide services at the school.

31.     B.H. changed to another private preschool that would allow B.H.'s ABA tutors to provide services while at school.

32.     D.H. submitted the IEE to CHUH.  In 2011, CHUH agreed that B.H. was eligible for special education services under the Autism category – 18 months after D.H. requested an initial evaluation.

33.    After B.H.'s IEP was developed and signed, D.H. exercised her option to apply for the Ohio Autism Scholarship Program.  B.H. is now served by an authorized registered scholarship provider and receiving ABA services.

34.    In 2014, B.H. was reevaluated as part of the IDEA's required triennial evaluation requirements and B.H. remains eligible for special education services.

35.    D.H. accepted the Autism Scholarship and moved to Shaker Heights City School District because CHUH could not provide appropriate services to B.H.  Shaker Heights City School District has run a budget deficit for the last three years.  It is expected to continue to run a deficit for the next five years.  By 2018, the deficit is expected to be almost seven million dollars.

## Plaintiffs L.J. and Mr. and Mrs. J.

36.    L.J. is a fourteen-year-old student with Down Syndrome who resides with her parents, Mr. and Mrs. J., in the Warren Local School District, a poorer district, in Washington County, Ohio.

37.    L.J. began receiving Early Intervention Services at three weeks of age.

38.    During her preschool years, L.J. had an IEP that included the services of an aide/paraprofessional, occupational therapist, physical therapist and speech therapist.

39.    L.J. entered kindergarten in the 2005-2006 school year.  L.J. was evaluated again to determine her need for Part B school age special education services.  At that time, Mr. and Mrs. J. requested that L.J. be identified in the Other Health Impairment ("OHI") category of eligibility.  Initially, the district refused to identify L.J. under the OHI category; however, after Mr. and Mrs. J. filed a complaint with the Ohio Department of Education ("ODE"), the district agreed to identify L.J. under the OHI category.

40.     Throughout L.J.'s school-age career, she has had a one-to-one aide/paraprofessional for support so that L.J. can be educated in the general education classroom.

41.     In the past, the district was reluctant to provide L.J. with an aide/paraprofessional because of the cost, but eventually provided the aide after Mr. and Mrs. J. filed a complaint with ODE.

42.     In the 2013-2014 school year, the district proposed reducing the aide's hours so that L.J. received fewer hours of the aide's support.  The district needed L.J.'s aide to cover a lunch period for another class to avoid the expense of hiring another aide.

43.     The current aide has been with L.J. since second grade, and L.J. will be entering 9th grade in the 2014-15 school year.  Mr. and Mrs. J. believe the aide is necessary to assist L.J. with her transition to 9th grade at the high school this coming school year.

44.     The IEP team met in April 2014 to develop a new IEP, which Mr. and Mrs. J. have not signed in agreement.  Again, the district inquired about the amount of the aide's hours and the aide's purpose.

45.     If the aide's hours are reduced, L.J. is at risk of not receiving the supports she needs for a FAPE in the general education classroom.

46.     The district's inquiry into the aide's hours coincides with a recent increase in the salary and benefits of the aide position throughout the district.

47.     The aide's position was recently classified as a union position increasing the pay for the position by $3.00 per hour.

48.     Also, several healthcare reform requirements under the Affordable Care Act ("ACA") went into effect at the beginning of 2014.  Specifically, the ACA now requires employers to offer healthcare coverage to employees who work more than 30 hours per week.

49. On information and belief, L.J.'s aide works above the 30-hours per week requirement.

50. On information and belief, the district reviewed the contracts of its employees to determine which of its employees now qualified for healthcare coverage.

51. On information and belief, the district adjusted some employee contracts to consider reducing the maximum number of hours the employee is permitted to work to remain under the 30-hours per week threshold.

52. On information and belief, the district inquired about L.J.'s aide's hours to assess as a cost-saving measure to mitigate the increase in pay and to avoid offering healthcare coverage to the aide.

53. Additionally, in the 2013-2014 school year, the district began participating in a new transition program for students with intellectual disabilities in association with Marietta College, the Pioneer Pipeline Project ("PPP"). Marietta College received a large grant ($15,000.00 for two years) from The Ohio State University Nisonger Center to fund the PPP program.

54. The PPP program helps transition students into the real world by teaching them basic life skills in a three-part process—employment, recreation and academic— to help the students become more socially and functionally independent. In the 2013-2014 school year, it was available only to students from Warren High School who were at least sophomores. The PPP program will include freshman in the 2014-2015 school year.

55. L.J. will be eligible for the PPP program in the 2014-2015 school year and Mr. and Mrs. J. want L.J. to enroll in this program. Each student's IEP team determines whether the student will participate in the PPP program.

56.     The PPP program creates a resource dilemma for the school district because the district is responsible for providing qualified teachers for that program and also in the classroom for other students with disabilities who do not participate in the PPP program.

57.     Some students in the multiple disabilities classroom along with their classroom staff are participating in this program on some days of the week.  Since not all of the students are participating, the district must continue to serve those students who remain at school.  The district has indicated it does not have sufficient resources to recruit and fund a position for a qualified special education teacher to serve the students not participating in the transition program.  As a result, the students who are not participating in the PPP program are divided into other resource rooms on the days the program is in session.  These classrooms are not designed for students with multiple disabilities.

58.     On information and belief, by not providing appropriate educational services and supports to students not participating in the PPP program the district is denying those students a FAPE.

59.     On information and belief, the district is aware it does not provide FAPE to those students who are not participating in the PPP program by placing them in resource rooms on the days the program is in session, and the district does not have the resources to change this.

60.     On information and belief, because of resource concerns, the district is unable to attract and maintain qualified personnel to provide a FAPE to students with disabilities.

61.     For example, the intervention specialist assigned to the multiple disabilities unit at the high school left to teach at the elementary school level.  This is the third teacher to leave this unit in the past 5 years.  On information and belief, the teacher left the high school because she did not receive the resources she needed to provide the students in that unit with FAPE.  The

teacher requested approval from the district to purchase functional curriculum materials to guide the class instruction. The district denied her request.

62. On information and belief, the multiple disabilities classroom does not have the resources necessary to facilitate the students' access to the general curriculum through the functional model. Accordingly, the students in the multiple disabilities unit do not have access to a FAPE.

63. The district is also discussing other cost-saving measures that will place students with disabilities at risk of denial of FAPE. For example, on information and belief, the district is contemplating replacing several aides currently assigned to the multiple disabilities classroom at the high school with one intervention specialist. The combined salaries of the aides cover most or all of the salary for an intervention specialist. By replacing the aides with one intervention specialist, the district would be required to provide a salary and insurance for one employee rather than several. Thus, the district may replace multiple staff members with one. If the district reduces the number of aides in the multiple disabilities room it also reduces the support provided to the students in that room that they need for the provision of FAPE.

64. Warren Local School District had a budget deficit in 2013.

65. The district is expected to have a budget deficit for four of the next five years. By 2018, the deficit is expected to be over three million dollars.

**Plaintiff C.S. and A.S.**

66. Plaintiff A.S. is the adoptive parent of C.S.

67. A.S. and C.S. reside in the Northern Local School District in Perry County, Ohio.

68. C.S. is fourteen years old and has been receiving special education services since preschool.

69.     C.S. is nonverbal, and has been diagnosed by private professionals as having scoliosis, cerebral palsy, epilepsy, hydrocephalus, speech impairment, specific learning disabilities, and low vision.

70.     C.S. was identified for Part B special education services under the eligibility category of Multiple Disabilities.

71.     For the last four years, C.S. has been enrolled in the online Ohio Virtual Academy because of his previous experience in Northern Local School District.

72.     In the 2009-2010 school year, C.S. was served by Northern Local School District in a classroom for students with multiple disabilities.

73.     During that school year, A.S. requested several necessary services for C.S. that the district denied, including increased services required by C.S.'s IEP.

74.     For example, C.S.'s 2009-2010 IEP required direct speech/language and occupational therapy services.  A.S. requested 30 minutes per week each of direct occupational and speech therapy services; however, the district denied this request and provided only 15 minutes per month of each therapy service.

75.     C.S.'s 2009-2010 IEP also required only twenty minutes per month of physical therapy to be performed by the physical therapist or physical therapist assistant.  The twenty minutes of physical therapy under C.S.'s IEP was not provided directly to C.S., but was instead provided as a consult to the special education teacher only.

76.     A.S. requested direct physical therapy be provided to C.S., but the district denied the request.

77.     At the time, the district did not employ a physical therapist assistant to perform these tasks.

78.     A.S. obtained direct occupational therapy, physical therapy, and speech-language therapies from private providers to meet C.S.'s needs.

79.     C.S.'s 2009-2010 IEP called for one-on-one instruction, attendant services, and nursing services in the resource room.  However, the IEP did not specify the duration or frequency of the provision of those services such that the district could decide when the services were provided and for how long.

80.     A.S. repeatedly requested and C.S. was denied personal hygiene instruction from the district.

81.     The district denied A.S.'s request to arrange for transport or an aide for C.S. to attend school field trips.  A member of C.S.'s IEP team stated that cost was the reason the district denied transportation to C.S.  As a consequence of the district's refusal to provide transport and an aide/paraprofessional for field trips, A.S. personally provided transportation and was present on all field trips for C.S.

82.     A.S. also requested a speech generating device from the district to aid C.S. in communicating and a walker for C.S.'s mobility.  The district denied each of these requests.

83.     Finally, A.S. requested extended school year ("ESY") services that the district denied.

84.     After the 2009-2010 school year, A.S. withdrew C.S. from the district because of its failure to provide services and enrolled him into the Ohio Virtual Academy where C.S. received all instruction and related services A.S. requested, including direct occupational, physical, and speech/language therapies, ESY services, and one-to-one instruction.

85.     For the 2014-2015 school year, A.S. intends to re-enroll C.S. in Northern Local School District where he will be at risk of not receiving a FAPE due to the current funding system.

**Plaintiffs Z.D. and parents S.D. and G.D.**

86.     S.D. and G.D. are the parents of Z.D., a fourteen-year-old student who has been identified as having sensory integration dysfunction, attention deficit hyperactivity disorder ("ADHD"), and autism.

87.     Z.D.'s intelligence has been measured in the high average range.

88.     Z.D. receives special education services from his school district of residence, Parma City School District.

89.     Z.D. was evaluated in 2004 as a preschool student and identified as a student with a disability for Part B services.

90.     When he entered kindergarten, Z.D. was evaluated for Part B school age special education services and found eligible. Z.D. was classified under the OHI (minor) category of disability, in part, because of heightened alertness to environmental stimuli. In the 2011-2012 school year, Z.D.'s category of eligibility was changed to Autism.

91.     At several points during Z.D.'s school career, the district has provided a one-to-one aide for him throughout the school day for behavior and organizational support.

92.     In the 2013-2014 school year, Z.D. transitioned to the high school to attend eighth grade. He also began attending some science, technology, engineering, and mathematics ("STEM") classes. Z.D. is in the regular education classroom for all other classes with support from an intervention specialist.

93.     S.D. and G.D. requested a one-to-one aide to assist Z.D. in transitioning to the high school building and in his STEM classes to minimize behavioral issues that may have arisen.

94.     The special education administrator asked the high school administrator if her budget would allow for an aide, and the high school administrator said "no." The high school administrator then asked the special education administrator if she could provide the resource and she indicated "no" as well.

95.     The district agreed to provide a one-to-one aide for Z.D. in the first few weeks of his transition to the high school and collect data on whether the aide was necessary for the future.

96.     After the data was collected, Z.D.'s IEP team, with the exception of S.D. and G.D., determined the aide was not needed and discontinued the service.

97.     S.D. and G.D. challenged the validity of the data due to several errors such as reporting Z.D. completed a task when he did not.

98.     Based on the statements by the administrators, S.D. and G.D. believe Z.D.'s aide was discontinued because the budget was insufficient to pay for the aide's services.

99.     From 2014 to 2018, the district is expected to lose over 6.5 million dollars in general property tax revenue. Currently, the district is expected to run a deficit of over 2.5 million dollars and by 2018, the deficit is expected to be over 11 million dollars.

**Plaintiffs C.S.U. and C.M.U.**

100.    C.S.U. is the parent of C.M.U., a fourteen-year-old student who has been diagnosed with Autism Spectrum Disorder. They reside in the Meigs Local School District in Meigs County, Ohio.

101.    C.M.U. is identified as a student with a disability under the eligibility category of Autism.

102.    C.M.U. requires speech and language therapy, assistive technology to communicate, occupational therapy, and behavioral therapy.

103.    C.M.U. received the Autism Scholarship and was enrolled in the private Haugland Learning Center in Meigs County, Ohio during the 2008-2009 school year.

104.    In the summer of 2009, Haugland Learning Center closed and C.S.U. sought special education services for C.M.U. through the Meigs Local School District.

105.    The district took the position that its current programs would not be suitable to serve the needs of students with autism, even with a one-on-one aide.

106.    The district refused to serve C.M.U. in its own classrooms because it would not serve him in any setting other than a self-contained classroom, and the district claimed it did not have any space or funding to serve C.M.U. in this setting.

107.    The district only offered home instruction or educational services through the local county board of developmental disabilities.

108.    The district never procured an aide or home instructor, and the county board of developmental disabilities classrooms were already at full capacity for the year.

109.    In fact, the district implemented a reduction in force due to lack of funding which included eleven aides and various teachers and administrators.

110.    As a result of the district's funding shortages, the district failed to serve C.M.U. in any manner for the 2009-2010 school year.  The district has not provided any compensatory education for the 2009-2010 school year.

111.    On information and belief, C.M.U. is a year behind on instruction because the district did not serve him for one school year due to lack of resources.

112.     C.M.U. receives services in the district in a segregated classroom with a one-to-one instructor, an aide, and no other students.

113.     C.M.U. has little access to same-age, non-disabled peers.

114.     On information and belief, C.M.U. is not receiving appropriate access to all general education curricula so that he can progress academically in all required subjects.

115.     C.S.U. has been forced to provide transportation for C.M.U. at her own expense to and from extended school year services because Meigs Local School District does not provide transportation during the summer.

116.     Meigs Local School District's ability to raise taxes is well below average.

117.     For example, the collection rate for the entire 2012 tax year, billed in 2013, was approximately 86.5%; therefore, FY14 property taxes are projected to be approximately $16,490 less than previously projected.

118.     By 2018, Meigs Local School District is projected to have a $125,401 deficit in operating funds.

## IV.     DEFENDANTS

### State of Ohio

119.     Defendant State of Ohio, through the General Assembly, is required to provide a system of public education to all Ohio school children, including children with disabilities, in accordance with the laws and Constitutions of the State of Ohio and the United States.

### Governor Kasich

120.     Defendant John Kasich is the Governor of the State of Ohio.

121.     Under Article III, § 6 of the Ohio Constitution, he is charged with seeing that the laws are faithfully executed.

122.     The Governor is required under Ohio Revised Code Section 107.03 and under the Ohio Constitution, to submit an Executive Budget to the legislature each fiscal biennium.

123.     Defendant Kasich submitted an Executive Budget in 2013 which failed to provide adequate funding for the provision of a free appropriate public education to plaintiffs and the plaintiff class.

124.     Defendant Kasich is required to exercise and maintain effective supervision and control over the expenditures of the state.

125.     If the Governor determines that the available revenue receipts and balances for the current year will be less than the appropriations for the year, he has the authority to issue orders to the state agencies to prevent their expenditures and incurred obligations from exceeding the revenue receipts and balances.

126.     Defendant Kasich is sued in his official capacity under the doctrine of *Ex parte Young*.

### State Superintendent Ross

127.     Defendant Richard Ross is the State Superintendent of Public Instruction for the State of Ohio.  Defendant Ross is charged with the overall responsibility for the administration of the laws and regulations governing the operation of Ohio's public schools, including the implementation and operation of school funding in the State.

128.     The superintendent of public instruction is the executive and administrative officer of the state board of education in its administration of all educational matters and functions placed under its management and control.  He executes, under the direction of the state board of education, the educational policies, orders, directives, and administrative functions of the board.

129.     Defendant Ross is sued in his official capacity under the doctrine of *Ex parte Young*.

### Ohio State Board of Education (OSBE)

130.     Defendant Ohio State Board of Education (OSBE) is the governing body charged with general supervision of public instruction in the State and having those powers enumerated in Ohio Revised Code Section 3301.07.

131.     The OSBE is charged with exercising policy forming, planning, and evaluative functions for the public schools of the state and leadership in the improvement of public education in this state.

132.     The OSBE administers the educational policies of the state relating to public schools, and relating to instruction and instructional material, building and equipment, transportation of pupils, administrative responsibilities of school officials and personnel, and finance and organization of school districts.

133.     The OSBE administers and supervises the allocation and distribution of all state and federal funds for public school education under the provisions of law.

### Ohio Department of Education (ODE)

134.     Defendant Ohio Department of Education (ODE) is the administrative unit and organization through which the policies, directives, and powers of the OSBE are administered. ODE is responsible for ensuring that each eligible student with a disability receives a free appropriate education and is required to exercise its general supervisory responsibility over all public entities which receive federal funds for the education of Ohio students.

135.     Within the ODE are the Office for Exceptional Children (OEC), and Office for Early Learning and School Readiness (OELSR).

136. The OEC provides leadership, assistance, and oversight to school districts and other educational entities in the provision of instructional support to students with disabilities.

137. OEC administers state and federal funds earmarked for students with disabilities and provides technical assistance to districts and educational agencies around issues of compliance with the Individuals with Disabilities Education Act.

138. The OELSR administers preschool special education programs in Ohio, including allocation of unit funding and monitoring and enforcing special preschool provider compliance with the IDEA.

## CLASS ACTION ALLEGATIONS

139. Plaintiffs properly bring this action pursuant to the Federal Rules of Civil Procedure 23 (b)(2) and (c)(l) on behalf of themselves and all persons similarly situated. The class is: All children, ages three through 21, currently enrolled or seeking enrollment, now or in the future, in Ohio's public school system, who have a disability under the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq*., the Rehabilitation Act of 1973, 29 U.S.C. §§ 790 *et seq*., or the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq*., and who require, as a result of their disability, special education and related services or accommodations that are designed to meet individual educational needs of children with disabilities as adequately as the needs of nondisabled children are met, and the parents or guardians of such children. Children who are disabled include those who are mentally retarded, who have a speech or language impairment, who are blind or otherwise visually impaired, who have a serious emotional disturbance, who have an orthopedic impairment, who are autistic, who have a traumatic brain injury, or who have some other health impairment or specific disability. Children who are disabled also include those who are multi-handicapped, who are developmentally handicapped, who are severe behavior handicapped, who have a specific

learning disability, who have attention deficit disorder or hyperactivity disorder, or who have a physical or mental impairment that substantially affects their ability to perform a major life activity.

140.    The requirements of Rule 23 (a) are met in that:

The members of this class are definite and ascertainable, but so numerous that joinder of all members is impracticable. The State of Ohio is responsible for identifying all children with disabilities. There are approximately 250,000 school age students with disabilities, comprising approximately 15% of the total school age population. In addition, there are approximately 23,000 special education preschool students receiving services under an IEP in Ohio.

There are questions of law and fact presented in this action that are common to members of the class. All students with disabilities are subject to the same inadequate special education funding policies and practices. All students have the right to a free and appropriate public education including appropriate educational services and placement in the least restrictive environment. Common legal questions include: 1) Whether systemic failures in the way Defendants fund Ohio's special education program have resulted in systemic denials of FAPE and/or created an ongoing risk for all class members that the inadequate funding will result in a denial of FAPE; 2) Whether the current system of funding special education in Ohio results in discrimination based on the disabilities of otherwise qualified students; and 3) Whether the current system of funding special education in Ohio adequately provides for a system that ensures that all students with disabilities can be provided a FAPE.

The claims of the named plaintiffs are typical of the claims of the class as a whole. Individually named plaintiffs have been subjected to the state funding policies and practices

outlined in this Complaint.  As a result of these funding policies and practices, they have suffered the same legal injuries that all students with disabilities have suffered and will continue to suffer.

The named plaintiffs will adequately represent the interests of the class.  Named plaintiffs have common interests with unnamed members of the class in seeking remedies to address the failures of the defendants to provide an adequate and fair system of funding and provision of special education.  All students with disabilities including the named plaintiffs are entitled to appropriate services in order to receive a FAPE, such that the rights of named individuals are not inconsistent with the rights of unnamed individuals.  Moreover, the named individuals are represented by attorneys who are well experienced in complex civil rights and special education litigation.

The defendants have an obligation upon the receipt of federal assistance under the IDEA to ensure for the provision of a free appropriate public education to all students with disabilities.  By failing to ensure such a system here, Defendants have acted and refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole, pursuant to Federal Rule of Civil Procedure 23 (b)(2).

141.    This Court certified the class in February, 1996. (CM/ECF Doc 59).

## V.    FUNDING

142.    While the State of Ohio has gone through many iterations of school funding schemes since the inception of this lawsuit, the underlying systemic flaws that result in systemic denials of a free and appropriate public education (FAPE) to students with disabilities persist.

143.    These systemic flaws include:

a)    arbitrarily limiting special education funding to 90% of the only cost-based funding level;

b)      not providing mechanisms to update the funding for increasing costs or inflation;

c)      failing to determine the needed IDEA-required services for students with disabilities and not basing special education funding on a true determination of the cost of providing those services;

d)      providing capped and insufficient catastrophic funding for school districts; and

e)      creating a system of funding that fails to ensure adequate resources are available in all school districts.

144.    These shortcomings subject students with disabilities to an inadequate funding scheme that results in systemic denials of a FAPE and places them at ongoing risk of being denied a FAPE.

### Arbitrary and Insufficient Special Education Funding

145.    The State provides districts with additional financial aid for students with disabilities using weights originally developed by the Ohio Coalition for the Education of Children with Disabilities (OCECD).  Unfortunately, the State has never funded those weights at more than 90%.

146.    The special education funding system utilizes a series of weighted funding category amounts based on different disability labels.

147.    Special education additional aid is calculated by multiplying those weights by the average daily membership of each school district's students within the various disability

categories. This amount is then reduced by a state share index[1] that determines how much of the calculated additional aid a school district will actually receive from the state.

148. The weights that form the backbone of the special education funding system in Ohio are based on weights developed in a study by OCECD.

149. OCECD is Ohio's Parent Training and Information Center, a statewide nonprofit organization that serves families and children with disabilities in Ohio.

150. OCECD conducted a cost-based analysis project resulting in special education funding policy recommendations. This study was updated in 2006.

151. In 2006, when OCECD updated the original study, it concluded that at that time it would take $192.1 million in additional funding to update the costs from the original methodology and fund it at 100% instead of 90%.

152. The State continues to fail to fully fund the weighted amounts at 100% of OCECD's 2006 funding recommendations.

153. Instead, the weights still only fund special education at 90% of OCECD's 2006 funding recommendations.

154. This 90% funding level continues to be inadequate to fund a system that provides a FAPE to students with disabilities.

155. In addition, arbitrarily capping the funding at 90% with no regard for the actual costs discriminates against students without disabilities.

156. Because Ohio's funding system fails to fully or adequately fund the actual cost of a FAPE, students with disabilities are systemically denied a FAPE.

---

[1] The state share index is intended to account for a school district's wealth or income.

## Failure to provide mechanisms to update funding for rising costs

157.    Ohio school districts' expenses increase frequently with the rising costs of healthcare, insurance, transportation, and staff salaries.

158.    In addition, there are many costs associated specifically with special education, including, but not limited to related services, classroom aides and other personnel, out of district placements, and evaluations.

159.    These increasing costs are not adequately addressed through the special education weighted funding allocations.

160.    In addition to only funding special education weights at 90% of the 2006 OCECD study, by using set dollar amounts rather than multipliers, the weights do not adjust for inflation or any other rising costs.

161.    As a result, there will continue to be insufficient funding to cover the costs of giving students with disabilities a FAPE.

## Failure to determine and provide for the true cost of IDEA-required services

162.    The special education weights are approximations based on outdated data.

163.    No determination has been made as to the true cost of educating students with disabilities.

164.    Thus, the funding system does not determine or provide sufficient total funding for special education.

165.    Inadequate funding for special education prevents districts from offering competitive salaries to attract special education teachers and related service personnel, and counteract the shortage of particular types of professionals in Ohio.

166.     Inadequate funding for special education also causes students' placement options to be based on lowest cost, not on the student's least restrictive environment as required by the IDEA.

167.     Students with disabilities who have intensive needs are denied access to evaluations, related and support services, out-of-district placements, and other interventions due to cost.

168.     As a result of the State's failure to determine and provide funding for the true cost of IDEA-required services, students with disabilities are systemically denied a FAPE.

*Failure to factor in and update related services costs*

169.     Related services are services necessary to provide a student with a disability access to a FAPE.

170.     These IDEA-required services are not fully reflected in the weighted formula.

171.     The original OCECD study was conducted in 2000 and was based on a 1982 version of the Ohio Administrative Code Chapter 3301-51, which did not include all related services currently mandated under the IDEA for students with disabilities. While the updated 2006 OCECD study made recommendations for updating the weights to account for new requirements, upon information and belief, the State has not fully updated the weights to account for all related services mandated by the IDEA.

172.     Some of the currently mandated services which were not factored into the special education weights include the cost of behavior intervention services; occupational therapy; physical therapy; speech; personal attendants and teachers' aides; social work services; assistive technology devices and services; expert consultants to advise district staff in cases where a student with disabilities has difficult behaviors or unusual needs; transition services beginning at

age fourteen; extended school year (ESY) services (special education services provided to students with disabilities beyond the traditional 180-day school year); medical evaluations as part of the multi-factored evaluation process; and independent educational evaluations (IEE) at public expense if parents disagree with an evaluation obtained by the school district.

173.    Because the formula is based on outdated data that do not include many of these services, the current formula fails to ensure sufficient revenue to school districts to provide students with disabilities a FAPE, including needed related services.

174.    Related services are provided by two methods:  direct services by the licensed provider to the student or indirect/consultative services where the licensed provider consults with the educational staff but does not provide any related service directly to the student.

175.    It is often crucial for students with disabilities to receive related services, such as occupational therapy, physical therapy, and psychological services, directly from a licensed provider to provide the students a FAPE under the IDEA.

176.    However, because there is inadequate funding for related services, districts often provide only indirect or consultative services instead of direct services.

177.    Ohio's failure to adequately account for the cost of related services expenses exacerbates the overall funding deficiencies and contributes to systemic denials of FAPE and places students with disabilities at ongoing risk of denials of FAPE.

*Failure to Account for the Added Costs for Home Instruction*

178.    School districts are required to offer a "continuum of alternative placements" to students with disabilities.

179.    Home instruction is instruction provided to a student with a disability in the student's home or other community setting in lieu of instruction provided in the school building.

180. It is one placement option on the continuum that must be available to IEP teams when determining the appropriate educational placement for a student with a disability.

181. Home instruction must be available to any student with a disability who requires it, as determined by the IEP team, regardless of the type of disability rendering the student eligible for special education services.

182. An IEP team may determine home instruction to be necessary due to the child's unique needs which may be based on a variety of factors, including chronic sickness and diseases.

183. Students with disabilities who are placed on home instruction by the IEP team are still entitled to receive a FAPE.

184. Home instruction, like other educational services, must be provided by qualified professionals.

185. Since home instruction is provided at home or in the community, there are often significant personnel and travel costs in addition to those costs attendant to instruction that would typically be provided in the school setting.

186. Districts may need to contract with outside teachers, aides, related service providers, and evaluators in order to properly serve the child in home instruction.

187. Historically, districts could apply for additional state funds to help bear a portion of the additional cost of providing home instruction to students in some disability categories.

188. While the State's historic reimbursement levels for home instruction were woefully inadequate, this additional aid for home instruction reimbursement no longer exists, exacerbating an ongoing problem.

189.     Home instruction is often denied to students with disabilities because of the additional expense it requires.

190.     Home instruction is often provided in inadequate duration and intensity to students with disabilities because of the additional expense it requires.

191.     Ohio's failure to adequately account for the cost of home instruction exacerbates the overall funding deficiencies and contributes to systemic denials of FAPE and places students with disabilities at ongoing risk of denials of FAPE.

*Special Education Funding for Preschool Children*

192.     The State of Ohio is obligated to provide preschool special education services for all eligible children with disabilities in Ohio ages three through five.

193.     Preschool funding is not based on the true cost of educating preschool students with disabilities.

194.     While preschool special education funding is also based on the weights used for K-12 special education funding, only half of the weighted amount is provided.  This is true even if the preschool student is enrolled full time (*i.e.*, all day).

195.     This worsens the already inadequate weighted funding and results in systemic denials of FAPE for preschool age children.

## Caps on Catastrophic Aid

196.     The cost of providing the intensive IDEA-required services necessary to provide a FAPE to certain disability category students can have a devastating impact on a district's budget and the availability of funds to serve other students with disabilities.

197.     Districts may seek additional funds from the State through catastrophic aid for some of the additional costs they incur in providing a FAPE to certain high cost students with disabilities.

198.    Before a school district can be eligible for these additional funds, the district must meet a threshold amount of spending with its own funding.

199.    This threshold amount is higher than the weighted amount that a school district received for that disability category, and there is no allocation of state funds to assist districts with the gap between the weighted amount and the threshold level.

200.    Once that threshold amount is reached, the school district can apply for additional funding; however, at most, the State may fund half the cost above the threshold amount, and half the cost exceeding the threshold amount times the district's state share percentage.

201.    The fund allocated by Ohio General Assembly to reimburse districts for catastrophic costs is capped.

202.    Once the capped amount of funds is met, no additional state catastrophic aid is provided.

203.    Catastrophic aid funding regularly reaches the capped amount such that not all districts' legitimate requests are fulfilled.

204.    Catastrophic aid funding levels bear no relationship to actual need, and are thus woefully inadequate to provide a FAPE to students with these intensive needs.

205.    This inadequate catastrophic aid contributes to systemic denials of FAPE to students with significant disability-related needs and places all students with disabilities at ongoing risk of being denied FAPE, in violation of the IDEA.

### A System of Funding that Fails to Ensure Adequate Resources Are Available in all School Districts

*Basic aid*

206.    The State provides general funding for education in Ohio, but like special education funding, it is inadequate.

207.    The funding, known as "basic aid" or "the per-pupil base cost amount," is not based on the actual cost of providing an education to students in Ohio, and it is not adequately adjusted for inflation.

208.    Additionally, the formula for calculating districts' basic aid undergoes periodic changes that often result in significant decreases or increases in funding from year to year.

209.    In part to mitigate the impact of these fluctuations, Ohio uses what are called "guarantees" and "caps" that provides more (if on a guarantee) or less (if capped) basic aid to districts than they would otherwise receive. The system of "guarantees" and "caps" favors wealthier districts and disadvantages less wealthy, often rural, districts.

210.    Overall, basic aid does not provide school districts the funds they need to educate students, and it does not achieve the stated goal of funding equity. The inadequacy of basic aid has a direct impact on districts' ability to fund special education. The deficiencies in basic aid result in systemic denials of FAPE and place students with disabilities at ongoing risk of being denied FAPE.

*"Economically disadvantaged" funding*

211.    Ohio also provides "economically disadvantaged index funds" to some districts with disproportionate numbers of poor students.

212.    The amount of such funding is less than it was in 1999, although poverty in Ohio has increased since that time.

213.    The low level of such funding contributes to systemic denials of FAPE and the ongoing risk of denials of FAPE.

*Reliance on local property taxes*

214.    Ohio relies heavily on local tax levies, typically property value-based taxes, to

fund education in public schools.

215.    Local tax levies require a community vote.  Proposed new tax levies, particularly
in poorer districts, frequently fail, even when required to avert cuts in important student services
and supports.

216.    In addition, when the tax base of a school district increases through reappraisals
or updates of property values (for example, to account for inflation), this increase in property
valuation does not result in an increase in local revenue because Ohio law requires that property
tax revenue be held constant following a reappraisal or update.

217.    At the same time, Ohio school districts are experiencing increasing costs – for
healthcare, insurance, electricity, transportation, teaching and non-teaching staff salaries – that
are not adequately addressed through the state funding allocations.

*Financially troubled districts*

218.    There are many local school districts projecting budget deficits for the next
several years.

219.    To avoid deficits or low funds balances, financially troubled school districts must
reduce expenditures or increase revenues.  Since revenue increases are unlikely to occur, the
districts implement cost-saving measures, such as cuts in instructional staff.

220.    The distressed circumstances of financially troubled districts contribute to
systemic denials of FAPE and the ongoing risk of denial of FAPE.

## CAUSES OF ACTION

**VI.    FIRST CAUSE OF ACTION – IDEA**

221.    Plaintiffs re-allege Paragraphs 1-220.

222.    Defendants have failed to ensure the provision of and funding for a free
appropriate public education for all eligible children ages three through twenty-one in the least

restrictive environment according to the Individuals with Disabilities Education Act, 20 U.S.C. §§1400 *et seq*.

223.    A FAPE must be provided in the least restrictive environment, individually tailored to meet the unique needs of each student with a disability, and documented in each student's written IEP.

224.    In enacting the education funding scheme in Ohio, defendants deliberately ignored the funding requirements for educating students with disabilities.

225.    Defendants have failed to fully fund the special education weights and have no plans to fully fund the weights beyond 90%.

226.    The funding scheme does not provide sufficient funding of aides to support inclusion of students with disabilities in regular classrooms with typical students to the maximum extent appropriate as required by the IDEA.

227.    The funding scheme fails to factor in the costs of related services, and account for additional services added under the IDEA amendments and concomitant changes to Ohio's standards, such as assistive technology devices and services and extended school year services. By failing to factor in the costs of related services, plaintiffs have been denied needed related services including transportation, mental health counseling and physical therapies.

228.    Defendants have failed to provide sufficient funds for preschool special education, resulting in lower amounts of services than recommended and needed under the law.

229.    In addition, the state system of funding special education is insufficient because defendants have capped the funds available for catastrophic costs. Because insufficient funds are available, students with disabilities receive inadequate amounts of specialized instruction and services.

230.    Defendants have failed to monitor and ensure the IDEA funds and the special education weights are actually spent for those purposes and for the benefit of students with disabilities.

231.    Further, the funding formula for all students educated in Ohio is inadequate because it fails to account for the cost of educating students or adjust for inflation and other rising costs, and it relies heavily on local property taxes to fill in the funding gap it creates. These shortfalls fail to ensure a funding system wherein students with disabilities receive a FAPE.

232.    The Defendants' actions and inactions have resulted in systemic denials of the FAPE required by 20 U.S.C. §§ 1400, *et seq*., and implementing federal regulations 34 C.F.R. Part 300.

233.    The Defendants' actions and inactions subject all students with disabilities to a discriminatory and inadequate system of funding that places them at ongoing risk of a denial of FAPE.

## VII.    SECOND CAUSE OF ACTION – SECTION 504

234.    Plaintiffs re-allege Paragraphs 1-233.

235.    Defendants State of Ohio and ODE are recipients of federal funds and must provide services in a manner which does not discriminate against people with disabilities.

236.    Each plaintiff student and student class member is an "individual with handicaps" as defined in 29 U.S.C. 794 § 706(8).

237.    Each of the student plaintiffs and the student class members are an "otherwise qualified person."  They are all individuals who have disabilities and are entitled to receive a FAPE.

238.    Defendants provide federal financial support in whole or in part to subgrantees, i.e., local school districts, to provide services and facilities to students with disabilities.

239.    In devising a school funding scheme, defendants have deliberately discriminated against students with disabilities.

240.    Defendants have deliberately ignored the funding requirements for educating students with disabilities by, *inter alia*, failing to:  fully fund the special education weights, determine the true cost of educating students with disabilities, factor in the costs of related services, factor in inflation, or account for additional services added under the IDEA amendments and concomitant changes to Ohio's standards.

241.    Defendants have no plan to fully fund the special education weights.

242.    Students with disabilities are being educated in overly restrictive settings and are being excluded from participation in programs or activities for which they are otherwise qualified.

243.    Defendants have deliberately ignored the cost of educating students in Ohio such that the per-pupil base cost amount generated in the funding formula is insufficient; thus, exacerbating the deficiencies in funding amounts for students with disabilities.

244.    Defendants have acted in bad faith or have exercised gross misjudgment.  The Defendants' actions and inactions have resulted in systemic denials of the FAPE required by 20 U.S.C. §§ 1400, *et seq*., and implementing federal regulations 34 C.F.R. Part 300.

245.    Defendants' actions and inactions subject all students with disabilities to a discriminatory and inadequate system of funding that places them at ongoing risk of a denial of FAPE.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

A.     That the system of funding and providing services to students with disabilities be declared illegal as in violation of the Individuals with Disabilities Education Act, 20 U.S.C. § § 1401, *et seq*. and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794;

B.     That the Court enjoin the Defendants from failing to provide for and fund a system of services to students with disabilities that complies with the requirements of the above laws as declared by this Court;

C.     That the Court order remedial action that ensures there is a system of services to students with disabilities that complies with the requirements of the above laws as declared by this Court;

D.     That the Court award plaintiffs' attorneys' fees and costs in bringing this action;

E.     That the Court award such other relief as it deems equitable and proper;

F.     That the Court retain jurisdiction of this matter for the purpose of assuring compliance with its findings and orders.

Respectfully submitted,

s/Kerstin Sjoberg-Witt
Kerstin Sjoberg-Witt (0076405)
ksjoberg-witt@disabilityrightsohio.org
Laura Osseck (0082231)
losseck@disabilityrightsohio.org
Jason C. Boylan (0082409)
jboylan@disabilityrightsohio.org
Ohio Disability Rights Law and
Policy Center, Inc.
Disability Rights Ohio
50 W. Broad Street, Suite 1400
Columbus, Ohio  43215
Telephone:  (614) 466-7264
Facsimile:  (614) 644-1888

Counsel for Plaintiffs

Douglas G. Green
dgreen@steptoe.com
Jill C. Maguire
jmaguire@steptoe.com
Steptoe & Johnson LLP
1330 Connecticut Avenue, NW
Washington, DC  20036
Telephone:  (202) 429-3000
Facsimile:  (202) 429-3902

Ira A. Burnim
Judge Bazelon Center for Mental Health Law
1101 15th Street, NW, Suite 1212
Washington, DC  20005
Telephone:  (202) 467-5730
Facsimile:  (202) 223-0409

*Pro hac vice* Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing Plaintiffs' Third Amended Class Action Complaint for Declaratory and Injunctive Relief was filed on June 27, 2014 with the Clerk of Court using the CM/ECF system, which will provide notice of such filing to all registered parties.

s/Kerstin Sjoerg-Witt
Kerstin Sjoberg-Witt (0076405)